HELMER BANG AND ANOTHER v. CHARLES T. MILLER HOSPITAL AND ANOTHER. FREDERIC E. B. FOLEY, RESPONDENT.

88 N. W. (2d) 186.

February 14, 1958—No. 37,215.

*Bang, Nierengarten & Hoversten* and *William J. Nierengarten,* for appellants.

*Meagher, Geer, Markham & Anderson, O. C. Adamson II,* and

*David W. Nord,* for respondent.

*Jule M. Hannaford III, Curtis L. Roy,* and *Dorsey, Owen, Barker, Scott & Barber,* for Minnesota State Medical Association, amicus curiae.

FRANK T. GALLAGHER, JUSTICE.

Appeal from an order of the district court denying plaintiffs' alternative motion to vacate the dismissal of their action against Frederic E. B. Foley, herein referred to as defendant, or for a new trial.

This was an action for damages for alleged assault or unauthorized operation by the defendant on his patient, Helmer Bang, referred to herein as plaintiff. The latter contends that the question as to whether he expressly or impliedly consented to the operating procedures involved was one of fact for the jury. At the close of plaintiffs' case, the defendant moved for a directed verdict upon the grounds that plaintiffs had failed to prove any actionable negligence or any cause of action against him. This motion was treated by the trial court as a motion for dismissal on the merits, which motion was granted. A similar motion was granted with respect to the other defendant, Charles T. Miller Hospital, but that action is not questioned on appeal.

The sole issue raised by the plaintiff on appeal is: Should the question of whether or not there was an assault or unauthorized operation have been submitted to the jury as a fact issue?

By way of a brief review, plaintiff began having urinary trouble in 1951 to 1952. He consulted a doctor in his home town of Austin, Minnesota, who sent him to the hospital for a cystoscopic examination which was made by two local doctors in Austin. Plaintiff testified that they informed him of an enlargement of the prostate gland and bladder soreness and recommended either Rochester or defendant in St. Paul as places he could go to have some tissue removed from the gland to overcome the trouble.

In any event, plaintiff consulted with the defendant on April 6, 1953, at the latter's office in St. Paul. The defendant testified that at that time the patient complained of diminished size and force of the urinary stream and increased frequency of urination. He said that the plaintiff described various urinary symptoms and that a rectal examination of the prostate was performed. Not being certain at that

time of the exact nature of the plaintiff's ailment, the defendant informed plaintiff that he wished to make a cystoscopic examination the following day and suggested that plaintiff be admitted to the Miller Hospital in St. Paul for further investigation, which was done. He said that he informed his patient "that the purpose of his going into the hospital was for further investigation with a view to making a prostate operation if the further examination showed that that was indicated."

The important question for determination of the matter presently before us is whether the evidence presented a fact question for the jury as to whether plaintiff consented to the severance of his spermatic cords when he submitted to the operation. Defendant testified on cross-examination under the rules that he did not tell plaintiff at the time of the office visit, April 6, that any examination defendant had made or was going to make had anything to do with the spermatic cord, nor did he recall explaining to his patient what a prostate-gland operation involved. He also said that plaintiff's life was in no immediate danger because of his condition on that day.

He was further questioned:

"Q.  Did you tell him in your office that if the later examination in the hospital the following day indicated prostate trouble it would be necessary for you as part of your operation to cut his spermatic cords?

"A.  I am not certain that particular detail of the operation was explained to him.

"Q.  Dr. Foley, is it not true that the only thing mentioned to Mr. Bang in your office was that a further examination was needed in order to confirm your diagnosis so that you would know what you were going to do next?

"A.  That is correct."

On the following day the operation was performed. When defendant was asked as to the procedure used, he replied:

"A.  * * * the cysto-urethroscopic examination was made; following that I went over to the head of the table and talked to Mr. Bang, told him what the findings were, and that in my opinion the transurethral prostatic resection should be done and I had his consent that we proceed with that operation.

"Q. Did you at that time as I understand it now ask him for his consent?

"A. Yes.

\* \* \* \* \*

"Q. \* \* \* did you at the time you talked to Mr. Bang on the table tell him anything about what you were going to do about his spermatic cords?

"A. I do not recall definitely whether that particular detail of the operation was discussed with Mr. Bang or not."

After identifying his signature to a carbon copy of some questions answered under oath by means of written interrogatories, the defendant was asked:

"Q. Were you asked the following question and did you give the following answer at that time? Did you inform Helmer Bang that in his specific case of a prostate gland resection that you intended to sever the spermatic cords of him as a part of the operation or that it was necessary to do so in his specific case? And did you so answer as follows, I did not inform Helmer Bang that as a part of the prostate gland resection it would be necessary to sever the spermatic cords of his.

\* \* \* \* \*

"Q. Did you also answer, severance of the spermatic cords—bilateral was section [vas section] and ligation—is a routine part of this procedure in all cases of patients the age of Mr. Bang?

"A. Yes.

"Q. Did you give that whole answer?

\* \* \* \* \*

"A. Yes.

\* \* \* \* \*

"Q. Did you at the same time, Dr. Foley, were you asked the following question and did you answer as follows, this in interrogatory 6. Did you inform Helmer Bang that as a part of a prostate gland resection it would be necessary to sever the spermatic cords of his? And did you answer as follows: I do not recall that I explained to him this particular technical detail of the operation any more than its other

details. But definitely I did not ask his permission to omit bilateral vas section and ligation (severance of spermatic cords)?

"A. Well, that is written down there as my answer.

\* \* \* \* \*

"Q. If it is here as part of your answer would you say you did, Doctor?

"A. I would think so.

\* \* \* \* \*

"Q. Did you ask his permission, Dr. Foley, to go ahead and sever the cords as part of the operation for any other reason?

"A. I have already said I am uncertain about that."

While it will serve no useful purpose to go into detail with reference to all of the testimony of plaintiff and defendant, the former described his consent to the procedure as follows:

"Q. Did you on that occasion, which was the 6th of April, 1953, in Dr. Foley's office, tell Dr. Foley that he could proceed and do anything he wished as far as operating on you is concerned?

"A. Well, he said he would look up in there, if there was any correction needed on the bladder is what I understood he would do and I said that was o.k. on the bladder.

"Q. Did he mention the bladder?

"A. Well, he didn't, well, that is what I told him my trouble was."

The patient recalled the start of the operation and, when questioned on direct examination, stated:

"Q. Did he at any time before the operation began tell you that he was going to cut your spermatic cords?

"A. No.

"Q. Did he at any time before the operation began tell you that it was necessary to cut your cords?

"A. No."

When questioned as to whether he had any conversation with the defendant at the operating table or during the entire period when he was in the operating room, plaintiff replied that with the exception

of a morning greeting "and stuff like that" nothing was said to him with reference to the operation.

When being questioned on cross-examination with reference to consent, the plaintiff was asked:

"Q. And you certainly did consent, didn't you, Mr. Bang, to Dr. Foley doing anything to correct your trouble which in his medical knowledge he felt should be corrected?

"A. Not anything he wanted to, no.

"Q. Did you put any limitation on his job as a surgeon?

"A. No.

"Q. When he said, if I find anything that needs correction I will do it at the same time and you said that was all right, that was all of the conversation there was, wasn't it?

"A. That was all of the conversation there was."

It is plaintiff's claim that he thought he was discussing his bladder because he understood from his Austin physicians something about burning out the ulcers if there were any ulcers in there. He admitted, however, that defendant said nothing to him about ulcers. Plaintiff also admitted that he did not expect to tell the doctor what to do; that he had faith in him; and that he did not expect to tell him how to perform the operation. He said that he expected the doctor would operate to do what was necessary to right and cure his condition. He testified that he did not ask the doctor what he intended to do and left it up to him to do the right thing.

It is our opinion that under the record here the question as to whether plaintiff consented to the severance of his spermatic cords was a fact question for the jury and that it was error for the trial court to dismiss the action.

In view of our decision that the case must be submitted to the jury, we deem it unnecessary to go into lengthy discussion of the law involved with reference to the question of consent. A leading case in this jurisdiction followed by other jurisdictions in this country[1] is Mohr v. Williams, 95 Minn. 261, 104 N. W. 12. In that case plaintiff consulted the defendant, a physician and surgeon of standing and character, as

---

[1]See, Annotation, 26 A. L. R. 1036.

is the situation here, with reference to a difficulty with her right ear. The doctor examined that ear and advised an operation, to which plaintiff consented. After the patient was placed under the influence of anesthetic and was unconscious therefrom, the defendant doctor examined her left ear and found it in a more serious condition than the right one and in greater need of an operation. He called the attention of plaintiff's family physician, who attended the operation at plaintiff's request, to the conditions he had discovered and finally concluded that the operation should be performed on the left ear instead of the right one. The family physician made no objection to this conclusion. Plaintiff had not previously experienced any difficulty with her left ear and was not informed prior to the time she was placed under the influence of anesthetic that any difficulty existed with reference to it, and she did not consent to an operation thereon. Subsequently, on the claim that the operation seriously impaired her sense of hearing and was wrongful and unlawful, she brought an action to recover for assault and battery. The trial resulted in a verdict for the plaintiff. Thereafter defendant moved for judgment notwithstanding the verdict or for a new trial. The trial court denied the motion for judgment but granted a new trial on the ground that the damage was excessive. Defendant appealed from the order denying the motion for judgment and plaintiff appealed from the order granting a new trial. It was held under the circumstances there that the defendant doctor had no authority to perform that operation without plaintiff's consent, expressed or implied; that her consent was not expressly given; and that whether it should be implied from the circumstances of the case was a question for the jury to determine. In reviewing the record in that case, this court concluded that the consent of the patient to the operation on her left ear was necessary and stated (95 Minn. 268, 104 N. W. 14) "It cannot be doubted that ordinarily the patient must be consulted, and his consent given, before a physician may operate upon him." The court then went on to say, however, that reasonable latitude must be allowed a physician in a particular case so as to not unreasonably interfere with the exercise of his discretion or prohibit him from taking such measures as his judgment dictated for the welfare of the patient in a case of emergency. The court pointed out there

that, if a person should be injured to the extent of rendering him unconscious and his injuries were of such a nature as to require prompt surgical attention, a physician called to attend him would be justified in applying such medical or surgical treatment as might reasonably be necessary for the preservation of his life or limb and consent on the part of the injured person would be implied.

Another situation could be that if in the course of an operation to which the patient consented the physician or surgeon discovered conditions not anticipated before the operation was commenced, and which if not removed would endanger the life or health of the patient, he would be justified in extending the operation to remove and overcome those conditions even though no express consent was obtained or given by the patient. The general rule seems to be well established that before a physician or surgeon may perform an operation on a patient he must obtain the consent either of the patient, if competent to give it, or of someone legally authorized to give it for him unless an immediate operation is necessary to save the patient's life or health, although under exceptional circumstances the consent may be regarded as having been impliedly given. Annotation, 76 A. L. R. 562, and cases cited, including Mohr v. Williams, 95 Minn. 261, 104 N. W. 12, 1 L. R. A. (N. S.) 439. Also see, Annotation, 56 A. L. R. (2d) 695.

While we have no desire to hamper the medical profession in the outstanding progress it has made and continues to make in connection with the study and solution of health and disease problems, it is our opinion that a reasonable rule is that, where a physician or surgeon can ascertain in advance of an operation alternative situations and no immediate emergency exists, a patient should be informed of the alternative possibilities and given a chance to decide before the doctor proceeds with the operation. By that we mean that, in a situation such as the case before us where no immediate emergency exists, a patient should be informed before the operation that if his spermatic cords were severed it would result in his sterilization, but on the other hand if this were not done there would be a possibility of an infection which could result in serious consequences. Under such conditions the patient would at least have the opportunity of deciding whether he wanted to

take the chance of a possible infection if the operation was performed in one manner or to become sterile if performed in another.

Reversed and a new trial granted.