Harriet KINIKIN, Respondent,

v.

Herman W. HEUPEL, M. D., Appellant,

Metropolitan Medical Center, Defendant.

Nos. 51313, 51337.

Supreme Court of Minnesota.

May 15, 1981.

Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, James F. Roegge and Robert M. Frazee, Minneapolis, for appellant.

Rischmiller, Wasche & Kniffel and Robert Wm. Rischmiller, Minneapolis, for respondent.

SIMONETT, Justice.

In this medical malpractice case the jury found the defendant surgeon was not negligent in the care and treatment of plaintiff, but that the doctor was liable for battery and negligent nondisclosure of surgical risks. Damages of $600,000 were awarded.

Defendant doctor appeals both from the trial court's order denying his post-trial motions for judgment notwithstanding the verdict or a new trial and from the final judgment. We affirm.

The action arises from breast surgery performed in 1976 on the plaintiff, Harriet Kinikin, by defendant, Dr. Herman Heupel. Basically at issue are the amount of damages, whether the plaintiff was properly informed concerning possible risks of the operation she consented to, and whether the operation actually performed was the one to which she consented.

Mrs. Kinikin is in her mid-fifties. Since youth her breasts have been large, pendulous and burdensome. Although she had considered cosmetic surgery, it was not covered by her health insurance and, without the coverage, she felt she could not afford it.

In August 1976, Mrs. Kinikin noticed a lump in her left breast, and her internist referred her to Dr. Heupel, a general surgeon, specializing in thoracic surgery. Dr. Heupel and Mrs. Kinikin were well acquainted. Between 1972 and 1975, Dr. Heupel had performed some nine or ten abdominal operations on Mrs. Kinikin. Each operation had been followed by severe complications, such as splitting of sutures, abscesses, and tissue necrosis. From their long association, they were friendly and generally candid with each other, and Dr. Heupel testified he was no less direct and open with Mrs. Kinikin about the possible consequences of the lump in her breast when she saw him on August 24, 1976. He explained to her the need for a mammogram, possibly followed by a biopsy and, depending on the results, a simple or radical mastectomy. Dr. Heupel was certain he also explained a procedure called an adeno-mammectomy, as well as the risks and possible complications of all these procedures. Mrs. Kinikin's response, according to the doctor, was, "We have been through a lot together, haven't we, so we know all these things can happen."

On August 26, 1976, a mammogram was taken, showing areas of calcification in the breast, suggesting cancer. On Dr. Heupel's advice, Mrs. Kinikin then entered the hospital where, on August 28, a bone scan was done. It was negative. On September 1, Dr. Heupel performed a biopsy. In preparing for this procedure, Dr. Heupel and Mrs. Kinikin had another talk. Mrs. Kinikin then signed a form consenting that, if the biopsy was positive for cancer, Dr. Heupel could proceed with a mastectomy or whatever other operation was necessary. Fortunately, the biopsy revealed no cancer. It did, however, disclose extensive fibrocystic disease, a benign condition which, nevertheless, is abnormal and a possible precursor of cancer.

After the biopsy, the doctor and his patient talked again. Dr. Heupel claims he told Mrs. Kinikin of discovering the fibrocystic disease and the options for treatment. She could do nothing, a course he advised against; she could have a simple mastectomy,[1] a course she rejected; or she could have an adenomammectomy. This last procedure, named by Dr. Heupel's late associate, involved removing the breast gland and diseased breast tissue only, leaving enough healthy breast tissue to supply the skin with blood and give the breast some shape. Dr. Heupel claims he had fully explained to Mrs. Kinikin what an adenomammectomy involved before the biopsy, including the risks it presented of infection, bleeding and tissue loss, although he assured her she would probably be pleased with the results cosmetically. He testified he repeated this recommendation after the biopsy and that Mrs. Kinikin agreed to the operation, understanding its objective was disease prevention while indicating it would satisfy her life-long ambition to have her breasts reduced in size by a method covered by insurance. The nurses' notes for September 5 and 6 record "Dr. Heupel explained surgery to her" and "[p]re-op teaching done, consent signed." Mrs. Kinikin did consent in writing to a "bilateral adenomammectomy."

The operation was performed on September 7, 1976, under general anesthesia. Instead of finding the fibrocystic tissue concentrated in the middle of each breast, Dr. Heupel found it throughout each breast. To remove all diseased tissue, he excised essentially all of each breast. In his discharge summary, Dr. Heupel noted he had performed a "subcutaneous mastectomy." After the operation, the incision failed to heal. What little skin envelope remained became necrotic; gangrene set in. The resultant scarring and deformity is pronounced.

A problem lies here with the medical terms used, their meaning, and the distinctions between them. Dr. Heupel testified that, unlike an adenomammectomy, a subcutaneous mastectomy involves the removal of virtually all breast tissue, leaving a skin envelope poorly supplied with blood and requiring an implant to give the breast shape. But this distinction, if it exists at all, is at best subtle. Both plaintiff's and defendant's experts testified the former operation was just another name for the latter. Risks and possible complications are determined by how much tissue is left to supply blood to the skin and thus differ not in nature, but in degree. Dr. Heupel himself described the difference between the two procedures as "fluid."

In addition, prophylactic procedures such as an adenomammectomy or a subcutaneous mastectomy are to be distinguished from a breast reduction (reduction mammoplasty), which is a purely cosmetic operation, usually performed by plastic surgeons. In contrast, an adenomammectomy or subcutaneous mastectomy is usually performed by general surgeons whose primary goal is removal of diseased tissue and to whom cosmetic results are incidental concerns.

It is Mrs. Kinikin's contention that what she consented to was an adenomammectomy and that what she got instead was a subcutaneous mastectomy. Dr. Heupel agrees, but responds there is essentially no difference between the two procedures. Mrs. Kinikin counters she understood "adenomammectomy" to be medical jargon for breast reduction. She denied the doctor explained the term to her before her biopsy. After the biopsy, she claims, Dr. Heupel only told her the lump was benign, never mentioning the presence of the fibrocystic disease. He suggested that, as long as she was hospitalized, he could perform what in effect would be a breast reduction; the result might not be as aesthetic as a plastic surgeon might provide, with minor scars and some slight deviation of the nipples, but it would not be unacceptable. She understood insurance would cover her costs supposedly because she originally had entered

---

1. As used in this trial record, a radical mastectomy involves removal of all breast tissue, the regional lymph nodes and tissue, and even chest muscle. In a simple mastectomy, only the breast glands and skin are removed.

the hospital for medically necessary tests, and this procedure was offered to ease her discomfort, not to improve her appearance. She denied the terms adenomammectomy and subcutaneous mastectomy were ever explained to her or their prophylactic purpose revealed. If the actual risks and potential complications of an adenomammectomy had been explained, she said she would not have consented to it.

### Battery

■ We first turn to defendant's claim that it was error to submit battery to the jury. He claims battery is only appropriate where, as stated in *Cornfeldt v. Tongen*, 262 N.W.2d 684, 699 (Minn.1977) (*Cornfeldt I*), the touching is of "a substantially different nature and character from that to which the patient consented." Here, an adenomammectomy and a subcutaneous mastectomy are much the same and, by consenting to the former, the patient consented to the risk that a little more tissue might have to be removed.

The evidence, however, was conflicting on the nature and character of the two surgical procedures as those terms were understood by the parties. It is undisputed that, after the biopsy, Mrs. Kinikin refused breast removal, a mastectomy, in the absence of proof of cancer. Yet what she received was, substantially, breast removal. We hold it was not error to submit battery to the jury.

■ Defendant next argues that, if battery was to be submitted, it was error for the trial court not to give his requested instruction based on *Bang v. Charles T. Miller Hospital*, 251 Minn. 427, 88 N.W.2d 186 (1958). Defendant's requested instruction was:

> [T]he consent, in the absence of proof to the contrary, will be construed as general in nature and the surgeon may extend the operation to remedy any abnormal or diseased condition in the area of the original incision whenever he, in the exercise

of his sound professional judgment, determines that correct surgical procedure dictates and requires such an extension of the operation originally contemplated.

The requested instruction, however, goes beyond *Bang*, and it was not error to have refused to give it. If in the course of an operation an unanticipated condition is discovered, *Bang* provides the surgeon may extend the operation to remove the condition if it "would endanger the life or health of the patient."[2] 251 Minn. at 434, 88 N.W.2d at 190. Here, while there was evidence that good practice dictated removal of the fibrocystic diseased tissue, such disease was not then endangering the plaintiff's life or health. Immediate removal of virtually all breast tissue was not necessary.

■ Finally, defendant asserts battery should not have been submitted along with negligent nondisclosure, since the two theories are "logically redundant." If the patient's consent is inadequately informed, it is, as a practical matter, no consent at all, and hence a battery. On the other hand, battery connotes an intentional invasion of another's rights, an aura of moral fault attaches, punitive damages may be available, and liability insurance coverage for the physician may be jeopardized.

■ It would seem battery is better utilized in the classic situation of a touching of a substantially and obviously different kind, such as operating on one ear when the patient's consent is given for the other, as in *Mohr v. Williams*, 95 Minn. 261, 104 N.W. 12 (1905), or where the patient consents to exploratory surgery and the doctor performs a mastectomy, as in *Corn v. French*, 71 Nev. 280, 289 P.2d 173 (1955). In a case such as this one, where the focus is more on the extent of the surgery performed and the attendant risks rather than on the kind of surgery, it would seem preferable to submit only negligent nondisclosure. To submit both theories in a case of this kind may be redundant and the parties run the

---

**2.** This same issue may arise in a negligent nondisclosure context, where nondisclosure is excused for emergencies. *See Cornfeldt v. Ton-* gen, 262 N.W.2d 684, 700 n. 13 (Minn.1977) (*Cornfeldt I*); *Cobbs v. Grant*, 8 Cal.3d 229, 502 P.2d 1, 104 Cal.Rptr. 505 (1972).

risk of an inconsistent verdict. *See Cobbs v. Grant*, 8 Cal.3d 229, 502 P.2d 1, 104 Cal.Rptr. 505 (1972). Here the jury found defendant was negligent in disclosing the risks of the surgery performed and that Mrs. Kinikin had not given her consent "to the surgical procedure which Dr. Heupel in fact performed."[3] There was no harm in this. While it would have been enough to submit only negligent nondisclosure, there were facts here sufficient to permit submission of battery also.

### Negligent Nondisclosure

■ Defendant next contends it was error for the trial court to submit the claim of negligent nondisclosure since this new cause of action was not announced until December 30, 1977, *Cornfeldt v. Tongen (Cornfeldt I)*, 262 N.W.2d 684, 699 (Minn.1977)—15 months after the surgery in question. We decline to decide this question, since it was never presented to the trial court; but we note, in passing, that the evolution of the doctor's duty to communicate, as observed in *Canterbury v. Spence*, 464 F.2d 772, 783 (D.C.Cir.), *cert. denied*, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972), "has hardly involved an extraordinary restructuring of the law."

Defendant agrees the trial court properly charged the jury under *Cornfeldt I* standards. He claims, however, these standards were modified in *Cornfeldt II, i. e., Cornfeldt v. Tongen*, 295 N.W.2d 638 (Minn. 1980), decided after defendant's trial, on August 8, 1980. He claims this modification would diminish the scope of his duty of

disclosure in this case and, therefore, that he is entitled to a new trial. We disagree. The clarification given in the second *Cornfeldt* appeal affords no basis for the claim that defendant's case was improperly submitted to the jury.

In *Cornfeldt I* we recognized a cause of action for negligent nondisclosure. We said we were not delineating a definitive standard but a standard that would be refined as cases developed. 262 N.W.2d at 701. We held a doctor had a duty to disclose medical risks to his patient. The existence of the duty depends on an objective standard: A duty to disclose arises if the doctor knows or should know of the risk. Once there is a duty to disclose, the next question is what must be disclosed, *i. e.*, the scope of the disclosure. *Cornfeldt I* established a duty to disclose, first, "known risk[s] of death or serious bodily harm," and, second, information which "a skilled practitioner of good standing would provide under similar circumstances." 262 N.W.2d at 702, quoting with approval *Cobbs v. Grant*, 8 Cal.3d 229, 244, 502 P.2d 1, 11, 104 Cal.Rptr. 505, 515 (1972). *Cornfeldt II*, describing plaintiff's burden of proof, stated he must show what risks and alternative treatments a physician is required to know, *and* "that a reasonable person in what the physician knows or should have known to be the patient's position would likely attach significance to that risk or alternative in formulating his decision to consent to treatment." To this was footnoted the following:

To the extent that our prior opinion suggests that a physician's duty to dis-

---

**3.** The special verdict was as follows:

1. Was defendant Dr. Herman Heupel negligent in failing to meet recognized medical standards in the treatment and care of Harriet Kinikin? Answer: No.

2. If your answer to Question No. 1 is "Yes," was such failing a direct cause of harm or injury to Harriet Kinikin? Answer:

    ———

3. Was defendant Dr. Herman Heupel negligent in failing to disclose to Harriet Kinikin the potential risks and complications of the surgery performed on September 7, 1976? Answer: Yes.

4. If your answer to Question No. 3 is "Yes," would reasonable persons in the posi-

tion of Harriet Kinikin have chosen an alternate form of treatment had the material facts been disclosed? Answer: Yes.

5. If your answer to Question No. 4 is "Yes," was the failure to disclose material facts a direct cause of harm or injury to Harriet Kinikin? Answer: Yes.

6. Did Harriet Kinikin give prior consent to the surgical procedure which Dr. Heupel in fact performed on her on September 7, 1976? Answer: No.

7. What sum of money will fairly and adequately compensate Harriet Kinikin for her damages? Answer: $600,000.00.

close extends *only to significant risks, i. e.,* death or serious harm, it is hereby modified.

295 N.W.2d at 640 n. 2 (emphasis added). This language did not reduce the scope of disclosure delineated in *Cornfeldt I.*

At trial, all medical experts, as well as Dr. Heupel himself, testified an adenomammectomy presents a significant risk of skin necrosis and that sound medical practice demanded the patient be informed of this risk. Indeed, Dr. Heupel stated he told Mrs. Kinikin at least once, if not several times, what an adenomammectomy involved, including its prophylactic nature and the risk of skin necrosis. Mrs. Kinikin, on the other hand, asserted she was never so informed, and the jury believed her. Now Dr. Heupel contends *Cornfeldt II* relieved him of his obligation to disclose this risk. He argues that, from his vantage, Mrs. Kinikin knew all about surgical risks, having experienced skin necrosis during her many abdominal operations, and, further, that she suffered from a "cancer phobia" which, to an observer, outweighed her concern for the cosmetic results of the procedure.

■ Defendant misconstrues *Cornfeldt II.* A physician must disclose risks of death or serious bodily harm which are of significant probability; to this there is no contention. Risks which a skilled practitioner of good standing in the community would reveal must also be disclosed and all medical experts testifying agreed the surgical complications affecting the plaintiff here were such risks. Lastly, to the extent a doctor is or can be aware that his patient attaches particular significance to risks not generally considered by the medical profession serious enough to require discussion with the patient, these too must be brought out. In determining whether risks of particular importance to the patient existed and whether his physician should have been aware of their importance, a jury must look to what a reasonable person in what the physician knows or should have known to be the plaintiff's position would consider significant when contemplating surgery. *Cornfeldt II,* 295 N.W.2d at 640.

■ That Mrs. Kinikin may have had a cancer phobia would not relieve Dr. Heupel of his duty to warn her of the risk of skin necrosis presented by prophylactic surgery on her breasts. Uncontroverted expert testimony established sound medical practice demanded the risks be disclosed. A peculiar or unfounded fear of cancer on her part might, if anything, require Dr. Heupel to devote more time discussing its probability with her, but not to the neglect of other risks which by their dire nature or medical practice require revelation. Defendant, then, has no cause to complain of the trial court's reliance upon *Cornfeldt I* in its charge to the jury on the physician's duty to disclose.

■ Concededly, a patient's own medical expertise or prior treatments could reduce the amount of information needed from an attending physician to permit the patient to make an intelligent decision concerning surgery. *See Canterbury v. Spence,* 464 F.2d 772, 780 n. 14 (D.C.Cir.), *cert. denied,* 104 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972). Perhaps at times or in certain communities it is medical practice to assume from a patient's medical history some medical expertise when explaining risks and alternate courses of treatment to him, although here the uncontroverted testimony of plaintiff's expert was to the contrary. In all situations, however, it is to the advantage of both the patient and his physician that the latter not presume too much upon the apparent experience or expertise of the former.

We do not mean by this that a physician may be liable for nondisclosure of a risk of which the patient had actual knowledge. To win her case, plaintiff had to prove proximate cause, of which there are two elements: first, that had a reasonable person known of the risk he would not have consented to treatment; and, second, that the undisclosed risk materialized in harm. If the physician could prove that the patient had actual knowledge of the risk which materialized, then his negligence

would be immaterial and the patient's case would fail. Here, Dr. Heupel maintained that Mrs. Kinikin's history of prior abdominal surgeries made her aware of the risk of skin necrosis presented by the breast surgery he performed and, hence, that any failure of disclosure on his part was not the proximate cause of her injuries. Mrs. Kinikin disputed this and the jury resolved the issue in her favor. We see no error.

## Damages

■ Finally, defendant claims the award is excessive. We disagree. The evidence shows that Mrs. Kinikin's breasts are seriously disfigured. Motion in her left arm is limited. Her physical activities are constrained, her self-image and sexual identity are impaired, and, despite counseling, she has become a recluse. Reconstruction of her chest, to the extent possible, would require three operations over a 3-year period, and each of these operations would present risks similar to the cause of her disfigurement. Defendant points to reasons other than the surgery for plaintiff's personality changes, to plaintiff's poor health and physical condition prior to the surgery, and to her relatively limited loss of income. We believe these matters were properly for the jury's resolution.

■ To be excessive, an award of damages must so greatly exceed what is adequate as to be accountable on no other basis than passion and prejudice. *DeWitt v. Schuhbauer*, 287 Minn. 279, 177 N.W.2d 790 (1970). The trial court felt the verdict was "well within the parameters of reasonableness." The decision to remit a verdict is for the trial court in the first instance, and its action will not be reversed unless its discretion is improperly exercised. *Young v. Hansen*, 296 Minn. 430, 435, 209 N.W.2d 392, 395 (1973). The trial court did not exceed the bounds of its discretion.

Affirmed.

SCOTT and AMDAHL, JJ., took no part in the consideration or decision of this case.