**Susan K. CLARK, Appellant,**

v.

**Donald B. MILLER, M.D., Respondent.**

**No. C6-85-670.**

Court of Appeals of Minnesota.

Jan. 7, 1986.

Review Denied Mar. 14, 1986.

Timothy G. Bailey, Robins, Zelle, Larson & Kaplan, St. Paul, for appellant.

Robert E. Salmon, J. Richard Bland, Meagher, Geer, Markham, Anderson, Flaskamp & Brennan, Minneapolis, for respondent.

Heard, considered and decided by HUSPENI, P.J., and FOLEY and FORSBERG, JJ.

## OPINION

FOLEY, Judge.

Susan K. Clark appeals from a March 6, 1985 judgment for Dr. Donald B. Miller following a medical malpractice trial and from a February 12, 1985 order denying her alternate motions for judgment notwithstanding the verdict and for a new trial. Clark's malpractice claim was based on knee surgery performed by Miller on March 27, 1980.

The case was submitted to the jury on alternate theories of negligent treatment and negligent disclosure of risks. Miller claimed that Clark was contributorily negligent in failing to follow post-operative instructions. By special verdict, the jury determined that Miller was negligent in his treatment of Clark, that he negligently failed to disclose significant risks of surgery and that Clark would have refused the surgery had the risk been disclosed. The jury also found Clark negligent but concluded that neither Clark nor Miller were the direct cause of the injury.

Clark claims that the jury's finding that Miller was negligent but not the direct cause of Clark's injury is irreconcilable, perverse and manifestly contrary to the evidence. She further alleges that the trial court committed prejudicial error when it (1) denied her requested instruction on a patient's right to limit surgical consent; (2) refused to include a claim for battery on the special verdict; and (3) submitted an emergency instruction to the jury despite uncontroverted evidence that the surgery was not life-threatening. We reverse and remand for a new trial on the issue of liability only.

## FACTS

Appellant initially contacted respondent, an orthopedic surgeon, in August 1977 complaining of stiffness and locking in her left knee. She told him that similar problems with her right knee required surgery in 1975. Appellant's medical record indicated that the surgery, a "Hauser transposition," was relatively successful in realigning appellant's right kneecap. The surgery did leave a scar on the inner side of her right knee.

Based on the similarity in symptoms, respondent made an initial diagnosis of chondromalacia, a degeneration in the cartilage underlining the kneecap. In December 1977, an arthrogram disclosed torn cartilage. In January 1978, respondent performed an Insall realignment, a procedure designed to strengthen the kneecap. He also removed cartilage, a procedure appellant had verbally authorized if medically necessary. The surgery left a scar on inner side and over appellant's left knee.

Throughout 1978, appellant's left knee developed an increased "crunching" sound. Respondent examined the knee and found evidence of articular damage, although alignment of the knee appeared normal.

In August 1979, appellant fell on her left knee and twisted it. She consulted respondent who drained the knee and injected cortisone to reduce inflamation of the joint. On March 7, 1980, appellant returned to respondent complaining that her left knee had "gone out" on several occasions and that pain around the kneecap had increased. Respondent's examination disclosed increased grating of the knee joint but no objective evidence of instability.

Respondent then discussed alternative treatments with appellant: arthroscopic shaving of the left knee and a lateral release, which would provide only temporary relief of pain; removal of the kneecap, an alternative appellant immediately dismissed; and a modified Maquet or "Hauser-Maquet" procedure, which respondent believed "might be of help to" appellant.

At trial, respondent admitted that he had not performed any modification of the Maquet procedure prior to appellant's surgery. A video-taped deposition of Dr. James Murray, an orthopedic surgeon from New York, was shown to the jury. Dr. Murray had studied with Dr. Maquet in Europe and had authored several articles on the Maquet procedure. Respondent had telephoned Dr. Murray prior to appellant's surgery to discuss results of the Maquet procedure.

According to Dr. Murray, in the traditional Maquet procedure the tibia is split lengthwise and used to elevate the tendon attached to the kneecap. The Hauser procedure is basically an alignment device. Both respondent and Dr. Murray identified infection and skin slough or tissue loss as the major risks of the Maquet procedure. At trial, respondent could not recall whether he specifically discussed the procedures underlying a modified version of the Maquet procedure with Dr. Murray.

Appellant testified that she told respondent to proceed with the Hauser-Maquet procedure *only* if the arthroscopic findings indicated severe arthritis or improper tracking of the kneecap. Respondent denied that appellant placed such strict limitations on the procedure. He testified that

he expected to find deep erosion under the kneecap and that appellant had authorized the procedure if he believed it was indicated.

Respondent's disclosure of surgical risks was also sharply contested by the parties. Respondent testified that he disclosed the risks of the procedure including infection, lack of bone healing, skin or tissue loss and scarring on March 7, 1980 and again during a subsequent phone conversation. He further stated that he told appellant he could not guarantee a good result. Appellant acknowledged that success of the procedure could not be guaranteed. On cross-examination, respondent admitted that these notations were not included in his office or surgical notes. Appellant testified that these specific risks were not disclosed although she agreed that her primary concern was potential scarring since she was a professional dancer.

Appellant was admitted to the hospital on March 26, 1980. On March 27, the morning of the surgery, she was asked to sign a consent form that contained the language "arthroscopy lateral release and intraarticular shaving left knee" but that did not mention the Hauser-Maquet procedure. Appellant pointed this out to the nurse but subsequently signed the release. Respondent testified that he spoke with appellant in pre-op about the consent form and told her he could either reschedule the surgery or proceed on the basis of their previous discussions. Appellant denied this conversation took place.

The arthroscopy revealed a marked improvement in appellant's knee cartilage from the 1978 surgery. The kneecap appeared to be tracking well.

Q You didn't find [significant disease of the patella] on the arthroscopy, did you, Doctor?

\* \* \* \* \* \*

A She had no crab meat at all. She had had crab meat before and that was gone.

Q In fact, I think you reported the overall appearance was quite smooth?

A That's correct.

Q And that the kneecap was tracking well?

A That's correct.

Dr. Murray stated that the findings indicated significant healing of the knee cartilage and no objective evidence of instability. Therefore, the arthoscopic results did not indicate that a modified Maquet procedure was necessary. Respondent believed, however, that existing scar tissue and a dipping in the kneecap plus appellant's subjective complaints necessitated further surgery. Dr. Jack Bert, a board certified orthopedic surgeon, concurred in this diagnosis, finding the apparent healing process irregular.

Respondent further testified that appellant's failure to follow medical advice in the past and the financial demands of supporting her children played a role in his decision to proceed with a more extensive knee surgery. He cited appellant's removal of the leg cast applied after the 1978 surgery, her claim that a cast inhibited her job as a professional dancer, her refusal to participate in dependency therapy and mental health treatment and her frequently cancelled appointments with him as examples of her uncooperative behavior. Appellant testified that she was forced to return to work prematurely to support her children. She further testified that the mental health treatment was related to spousal abuse and not chemical dependency. After review of the arthroscopic results, respondent proceeded with a modified Maquet procedure.

Both Dr. Murray and Dr. Bert testified that respondent's procedure varied from previously published versions of the modified Maquet. Dr. Murray testified that the procedure deviated from accepted medical practice. In particular, he pointed out that the tibular split was longer than prescribed in the traditional Maquet, that a lengthwise split of the tibia is not normally used in a Hauser-Maquet, that insertion of the block of pelvic bone added additional stress to the kneecap area and that surgical screws would have provided more stability to the region than the surgical staple used. On cross-examination, Dr. Murray agreed that the propriety of modifications to a procedure depended to a degree on the particular circumstance the physician was then facing. Dr. Bert disagreed, stating that it was acceptable for a physican to modify a procedure when, as in respondent's case, the surgeon understood the principles underlying the procedure.

Following the surgery, appellant's knee was placed in a knee immobilizer to prevent any bending motion. It was undisputed that respondent told appellant after surgery not to bend her knee. Six days after the surgery, the staple fixating the bone broke open, exposing a portion of bone in appellant's lower left leg. Respondent performed a second surgery on April 3 to refixate the bone.

Respondent testified that the bone fragment loosened because appellant disregarded his express orders not to bend her knee. Appellant denied bending her knee and stated that the staple popped open when she attempted to push herself up in bed. Dr. Murray stated that the staple opened because it was not adequately fixated to the bone during the initial surgery.

Appellant was released from the hospital six days later. At the time, her surgical wound had healed somewhat but was not completely closed. Respondent testified that total necrosis was indicated. Drastic tissue loss did result, leaving exposed bone in appellant's left leg approximately 2″ long and ½″ wide. Appellant was referred to Dr. Richard Werner, a plastic surgeon, who performed a skin graft. The grafting failed, and Dr. Werner testified that appellant's refusal to quit smoking was a possible explanation. Dr. Bert and respondent concurred in this opinion.

In 1981, after a number of further consultations, Dr. Kyle, an orthopedic surgeon, removed the fixating device from appellant's left knee and required that she wear a knee immobilizer. Appellant removed it shortly after her discharge. It was uncontested that appellant now suffers a permanent deformity of her lower left leg.

As part of her proposed jury instructions, appellant requested a specific instruction on a patient's right to limit surgical consent. This request was denied. During a discussion in chambers, appellant's counsel requested the inclusion of a battery question on the special verdict form in addition to the negligent nondisclosure question. The trial court denied the request. No additional requests to the special verdict form were made. The case was submitted to the jury on December 18, 1984. During the course of the deliberations, the jury sought additional clarification of the special verdict form on three separate occasions. On December 20, 1984, the jury rendered its verdict. Damages were assessed at $350,000.

## ISSUES

1. Is the jury's finding in the special verdict of no direct causation perverse and manifestly contrary to the evidence when the jury had already determined that respondent negligently failed to disclose significant surgical risks and that a reasonable person in appellant's position would have refused the surgery had the risks been disclosed?

2. Did the trial court err when it refused to instruct the jury on a patient's right to limit consent, when it failed to include a battery question in the special verdict and when it issued an emergency instruction despite no evidence suggesting that the surgery was life threatening?

## ANALYSIS

### 1. Jury Verdict

 A jury's finding on causation will not be upset on appeal unless it is manifestly contrary to the weight of the evidence. *Lamke v. Louden,* 269 N.W.2d 53, 56 (Minn.1978). A verdict should be liberally construed to reflect a jury's intention and its answers should be harmonized whenever possible. *Verhel v. Independent School District No. 709,* 359 N.W.2d 579, 592 (Minn.1984).

The test is whether the answers [to the special verdict] can be reconciled in any reasonable manner consistent with the evidence and its fair inferences.

*Bergemann v. Mutual Service Insurance Co.,* 270 N.W.2d 107, 108 (Minn.1978) (quoting *Reese v. Henke,* 277 Minn. 151, 155, 152 N.W.2d 63, 66 (1967)).

A new trial should not be granted unless the verdict is so contrary to the preponderance of the evidence as to imply that the jury failed to consider all the evidence or acted under some mistake or from some improper motive, bias, feeling or caprice, instead of honestly and dispassionately exercising its judgment.

*Lamb v. Jordan,* 333 N.W.2d 852, 855–56 (Minn.1983) (quoting *LaValle v. Aqualand Pool Co., Inc.,* 257 N.W.2d 324, 328 (Minn.1977)).

 Mindful of these standards, we believe reasonable persons could not disagree that the verdict here is perverse and irreconcilable with the facts. Accordingly, a new trial on the issue of liability is mandated.

A cause of action for negligent nondisclosure was first recognized in *Cornfeldt v. Tongen,* 262 N.W.2d 684 (Minn.1977) (*Cornfeldt I*). *Cornfeldt v. Tongen,* 295 N.W.2d 638 (Minn.1980) (*Cornfeldt II*), delineated the elements for negligent nondisclosure:

He must also show a duty to disclose the risk or alternate treatment plan by evidence establishing that a reasonable person in what the physician knows or should have known to be the patient's position would likely attach significance to that risk or alternative in formulating his decision to consent to treatment. He further must show breach of that duty, causation, and damage. * * * in [*Cornfeldt I*] we focused our discussion of causation on the question of whether to adopt a subjective or objective standard and ultimately determined that a plaintiff must show that a reasonable person, had he been informed of the risk, would not have consented to the procedure, we * * now emphasize, that an element of liabili-

ty is that the undisclosed risk materialize in harm as a result of the treatment. *Cornfeldt*, 295 N.W.2d at 640 (footnote omitted). *See Reinhardt v. Colton*, 337 N.W.2d 88, 95–96 (Minn.1983); *Plutshack v. University of Minnesota Hospitals*, 316 N.W.2d 1, 9 (Minn.1982). *See also Wheeldon v. Madison*, 374 N.W.2d 367 (S.D. 1985). The jury here received the following causation instruction:

> I instruct you that you are advised that the failure to advise a patient of the significant inherent risks of proposed surgery is not a direct cause of the injury unless you find that a reasonably prudent person would not have consented to the treatment when informed of those risks *and* that the treatment chosen caused injury to the patient. (emphasis supplied)

Appellant's negligence claims were submitted to the jury on two theories: negligent nondisclosure of significant risks of treatment and negligent treatment. By special verdict, the jury found as follows:

> 1. Was defendant Doctor Donald Miller negligent in his care and treatment of Plaintiff Susan Clark?
>
> _X_ Yes ___No
>
> If your answer to question number one is yes, then answer this question:
>
> 2. Was such negligence a direct cause of injury to Plaintiff Susan Clark?
>
> ___Yes _X_ No
>
> 3. Was Plaintiff Susan Clark negligent following the surgery of March 27, 1980?
>
> _X_ Yes ___No
>
> 4. Was such negligence a direct cause of injury to Plaintiff Susan Clark?
>
> ___Yes _X_ No
>
> 5. Was Defendant Doctor Donald Miller negligent in failing to disclose to Plaintiff Susan Clark any significant inherent risks of the surgery performed on March 27, 1980?
>
> _X_ Yes ___No
>
> If your answer to question number five is yes, then answer this question:
>
> 6. Would a reasonable person in the position of Plaintiff Susan Clark have refused to consent to the surgery actually performed had the risks of that actual surgery been disclosed to her?
>
> _X_ Yes ___No
>
> If your answer to question number five is yes, and if you answered question number six, and if your answer to question number six is also yes, then answer this question:
>
> 7. Was such negligent non-disclosure of any significant inherent risks of the surgery performed on March 27, 1980, a direct cause of injury to Plaintiff Susan Clark?
>
> ___Yes _X_ No
>
> \* \* \* \* \* \*
>
> Regardless of fault and regardless of your answers to or handling of the preceding questions, answer this question:
>
> 9. What sum of money will fairly and adequately compensate Plaintiff Susan Clark for her injury?
>
> $350,000.00

Appellant claims for the first time on appeal that the special verdict was in error since it failed to require a specific finding on whether the treatment chosen caused harm for the plaintiff or alternately, that the undisclosed risks materialized in harm as a result of the treatment. Respondent argues that appellant has waived her right to assign this as error since she neither requested the interrogatory in her proposed verdict nor objected to its form. In *Continental Insurance Co. v. Loctite Corp.*, 352 N.W.2d 460 (Minn.Ct.App.1984), we faced a similar situation when the manufacturer first objected to the form of the special verdict in its motion for new trial. We did not find support for a waiver under Minn.R.Civ.P. 49.01 and held that the failure to raise specific objection to the form of the special verdict prior to submission to the jury, did not prevent review of inconsistencies that developed thereafter. Since this is not the basis for our decision, we need not decide the propriety of appellant's claim under the circumstances of this case.

The jury determined that respondent negligently failed to disclose the significant risks of surgery and that a reasonable person in appellant's position would have refused the treatment had she been properly informed. Taken together, these answers support a finding of a causal connection between respondent's negligence and appellant's harm. *See Cornfeldt II* at 640. To reconcile these answers with a finding of no direct cause would compel the conclusion that: (1) the undisclosed risks did not result in harm, or (2) the undisclosed risks that actually materialized were not caused by the surgery. We cannot do so.

■ In a negligent nondisclosure case, expert testimony is necessary to establish that a risk of the procedure exists, that it is accepted medical practice to know of that risk and that it is more probable than not that the undisclosed risk materialized in harm. *See Cornfeldt I*, 262 N.W.2d at 702; *Cornfeldt II*, 295 N.W.2d at 640–41. Here, the expert testimony established that skin slough (tissue loss) and infection were significant risks of the Maquet procedure. Both respondent and Dr. Murray testified that these risks were discussed during their telephone conversation. The record further established that respondent had performed at least one traditional Maquet prior to appellant's surgery. Therefore, he was aware of the underlying surgical risks involved.

Respondent and Dr. Murray agreed at trial that a severely compromised blood supply to the surgical area was the primary cause of the resulting skin loss. They differed, however, on the role of each surgery in contributing to this factor. Respondent testified that the second surgery to refixate the bone was the primary cause of compromised blood to the area.

Dr. Murray stated that procedures employed during the original surgery caused the loss of circulation. In his opinion, this was due to the relative remoteness of the scar from the blood supply and from insufficient fixation of the bone which caused additional internal bleeding. It was undisputed among the experts at trial that the second surgery was required only to refixiate the loosened bone fragment. By respondent's own admission, loosening of the bone fragment was a known risk of this procedure.

> [Skin slough] and the infection I think are the two biggest concerns * * *. There is a possibility of something could break loose and redo it or something. Because you are using internal fixation. If you use something very heavy, you will tear the tissue away. If you use something lighter, the internal fixation will give away. * * * something like this can happen [sic].

The evidence further established that respondent noted a discoloration in the tissue surrounding the incision on April 2, 1980, the day before the second surgery. Dr. Murray testified, without contradiction, that the discoloration indicated compromised blood supply to the area.

Appellant was discharged from the hospital six days after the second surgery. At the time, the skin around the incision had eroded away leaving an open wound approximately 2″ long and ½″ wide. Respondent acknowledged that wound was headed toward total necrosis upon discharge. The extent of the injury, now permanent, further supports a finding of direct cause.

We also think it is significant that skin slough, an acknowledged risk of this procedure, relates directly to scarring, which both parties acknowledged as appellant's primary concern. Respondent knew that appellant was a dancer and the primary caretaker of her children. Appellant's cosmetic concerns were thus directly related to her ability to earn a living and support her children. If the jury determined that skin slough was an undisclosed risk and that appellant would have refused the surgery because of the scarring potential, a finding of direct causation necessarily follows. The greater weight of the evidence establishes that skin slough materialized in harm to appellant.

Respondent contends that the verdict as a whole can be reconciled since the jury

could have found that appellant caused the injury when she bent her knee contrary to respondent's orders. In this way, the jury could have determined that the undisclosed risks did not materialize in harm. Respondent points to his uncontroverted testimony that appellant was healing normally during the week after surgery, to appellant's refusal to follow medical advice in the past, to Dr. Werner's testimony that appellant's refusal to quit smoking contributed to the inability of the wound to heal, and to Dr. Bert's corroborating testimony that bending of the knee caused the injury.

This argument must fail for two reasons. Without the Maquet procedure, appellant would not have been in the position where bending her knee could have loosened the bone fragment. Appellant here did not suffer from an underlying disease that could have caused the injury as in *Cornfeldt I.* Second, the jury found appellant negligent following the surgery but that such negligence was not the direct cause of the injury. If the jury believed that appellant interrupted the causal chain by bending her knee or by refusing to quit smoking, we think it would have indicated this by finding her the direct cause of the injury.

Respondent argues that a number of Minnesota decisions have upheld a jury's finding of negligence without causation and urges us to do the same. *See, e.g., Fallin v. Maplewood-North St. Paul District No. 622,* 362 N.W.2d 318 (Minn.1985); *Hauenstein v. Loctite Corp.,* 347 N.W.2d 272 (Minn.1984); *Norberg v. Northwestern Hospital Association, Inc.,* 270 N.W.2d 271 (Minn.1978); *Kilbane v. County of Ramsey,* 292 Minn. 86, 193 N.W.2d 301 (1971); *Sabasko v. Fletcher,* 359 N.W.2d 339 (Minn.Ct.App.1984), *pet. for rev. denied,* (Minn. March 21, 1985).

While we recognize the vitality of these decisions, we think they are distinguishable from the present case. In each of these cases, the jury could reasonably have concluded that the injuries sustained would have occurred even if due care had been exercised. None of these cases dealt with a claim based on negligent nondisclosure of risks.

The present case is further distinguishable from *Plutshack v. University of Minnesota Hospitals,* 316 N.W.2d 1 (Minn. 1982), where the court affirmed a directed verdict for the hospital on the claim of negligent nondisclosure. In *Plutshack,* the plaintiff, a mother of a five-month-old child, presented no evidence to indicate that cardiac arrest, the risk that materialized in harm, was a significant risk of the procedure when performed on a child in her son's position. Here, the greater weight of the evidence supports that the undisclosed risks, be it skin loss, infection or loosening of the bone fragment, materialized in harm. We find no basis for concluding that the significant scarring resulted from anything but the Maquet procedure.

█ We further note that the jury requested additional explanation on causation and negligence on three occasions during its deliberations. Requiring the jury to find direct cause under each theory on the special verdict was apparently the trial court's attempt to maintain consistency in the findings. Under the circumstances, we think the special verdict should require the jury to find that either the undisclosed risks materialized in harm or that they caused the injury. Utilizing this language would better avoid the risk of inconsistency in the verdict and effectuate the law under *Cornfeldt I* and its progeny.

### 2. Jury Instructions

█ A trial court is afforded broad latitude in determining the propriety of a specific instruction. *Kalsbeck v. Westview Clinic, P.A.,* 375 N.W.2d 861 (Minn.Ct.App. 1985). If it is plain that a more specific instruction will better enable the jury to intelligently determine the question, the trial court should observe the party's request. *Hagen v. Snow,* 244 Minn. 101, 69 N.W.2d 100 (1955). A party is entitled to a specific instruction on his theory of the case when there is evidence to support the instruction and the instruction is in accordance with applicable law. *Sandhofer v. Abbott-*

*Northwestern Hospital,* 283 N.W.2d 362, 367 (Minn.1979).

Appellant contends that the trial court's refusal to allow requested jury instructions and its inclusion of an emergency instruction constituted prejudicial error. Minnesota Rule of Civil Procedure 51 requires that a party object to unintentional misstatements or omissions in the charge before the jury retires to consider its verdict. In *Fallin v. Maplewood-North District No. 622,* 362 N.W.2d 318 (Minn.1985), the court noted that trial counsel "failed to object to the jury instructions, and *no addition to the instructions was requested." Id.* at 322 (emphasis supplied). Here, trial counsel requested the following instruction:

> Ordinarily, a doctor may not perform an operation on a patient without the patient's consent, stated directly or implied. *A patient also has the right to impose express limitations or conditions on the doctor's authority to perform an operation.* (emphasis supplied)

The trial court gave only the first sentence of the instruction which is essentially the first paragraph of JIG II, 427 G–S. The trial court went on to instruct the jury as follows:

> If, however, during the course of an operation to which the patient has consented, the doctor discovered conditions not reasonably forseen before the operation and which necessitates further or different treatment *in order to protect or preserve the patient's life or health* and it is then impossible or impractical to obtain the consent of the patient or someone authorized to consent for the patient, the doctor may perform the needed treatment if his decision to do so and what he does are in accordance with what the practice of doctors or specialists in good standing under like circumstances. (emphasis supplied)

■ The scope of respondent's consent was hotly disputed at trial. Appellant claimed that she authorized the procedure only if respondent discovered arthritis or malalignment. Respondent claimed that he would not so limit his authority. Moreover, experts on both sides agreed that a patient has a right to impose express limitations on a doctor's authority in this jurisdiction. *See Kinikin v. Heupel,* 305 N.W.2d 589, 593 (Minn.1981). Under these facts, it appears that the instruction should have been given. On remand, the court should permit the instruction if it is reasonably supported by the evidence. Further, the court should omit any reference to an emergency in its instructions since it is undisputed that nothing developed during the course of the operation which necessitated "further or different treatment in order to protect or preserve the patient's life or health," as those terms are used in the instruction.

■ Appellant lastly argues that the trial court erred in refusing to permit a battery claim on the special verdict. She relies on the *Kinikin* case for support. In *Kinikin,* the surgeon performed a procedure similar to a mastectomy when the biopsy was benign and even though it was undisputed that the patient refused any form of breast removal. The jury found the doctor liable for both battery and negligent nondisclosure. The supreme court upheld the verdict. Addressing the doctor's claims that it was error to submit claims which were "logically redundant", the court stated:

> It would seem battery is better utilized in the classic situation of a touching of a substantially and obviously different kind * * *. In a case such as this one, where the focus is more on the extent of the surgery performed and the attendant risks rather than on the kind of surgery, it would seem preferable to submit only negligent nondisclosure. * * * While it would have been enough to submit only negligent nondisclosure, there were facts here sufficient to permit submission of battery also.

*Kinikin,* 305 N.W.2d at 593–94.

On remand, the trial court, guided by *Kinikin,* should reconsider whether the evidence supports submission of both negligent nondisclosure and battery claims.

## DECISION

Jury's special verdict that respondent negligently failed to disclose significant risks of treatment, that a reasonable person in appellant's position would have refused the surgery, but that respondent was not the direct cause of the injury, is irreconcilable and manifestly contrary to the evidence. A new trial is therefore mandated on the issue of liability only. On remand, the trial court should (a) consider whether the evidence supports giving an instruction on a patient's right to expressly limit a doctor's authority; (b) omit an emergency instruction when it is undisputed that nothing during the operation necessitated treatment to preserve or protect the patient's life or health; and (c) determine whether inclusion of both battery and negligent nondisclosure claims on the special verdict is appropriate in light of the evidence presented.

Reversed and remanded for new trial on liability only.