K.A.C., et al., Plaintiffs,

T.M.W., Respondent,

R.E.S., et al., Plaintiffs,

v.

Dr. Philip D. BENSON, et al.,
Petitioners, Appellants.

Nos. C4–93–1328, C5–93–1306, C6–93–1203.

Supreme Court of Minnesota.

Feb. 10, 1995.

James C. Wicka, Jeffrey M. Ellis, Messerli & Kramer, Minneapolis, for respondent.

Judy Emmings, John W. Carey, Sieben, Gross, Von Holtum, McCoy & Carey, Ltd., Fairfax, for plaintiff K.A.C., et al.

Robert K. Randall, Randall & Parmater, Ltd., Minnetonka, for plaintiffs R.E.S., et al.

## OPINION

STRINGER, Justice.

Plaintiff-respondent, T.M.W., brought this action against Dr. Philip Benson and the Palen Clinic for emotional damages she allegedly suffered upon learning that Dr. Benson had performed upon her two gynecological procedures while Dr. Benson was infected with the human immunodeficiency virus (HIV)[1] and was suffering from open sores on his hands and forearms. We reject plaintiff's claims and hold that a plaintiff must allege actual exposure to HIV in order to establish a claim for emotional damages resulting from a fear of contracting AIDS.

Over 50 former patients, including T.M.W., filed complaints against defendants asserting various claims. The district court filed a series of orders resulting in summary judgment in favor of defendants because plaintiffs failed to allege actual exposure or direct contact with Dr. Benson's HIV-infected blood or body fluids. In its unpublished opinion, the court of appeals affirmed in part and reversed in part, holding that a genuine issue of material fact existed as to whether Dr. Benson placed his patients in a "zone of danger."[2] *K.A.C. v. Benson*, No. C6–93–

William M. Hart, Christopher J. Schulte, J. Richard Bland, Barbara A. Zurek, Meagher & Geer, Minneapolis, for appellants.

1. HIV is the retrovirus that causes acquired immune deficiency syndrome (AIDS). HIV invades and replicates in host cells, notably T-lymphocytes, a type of white blood cells that are essential to the functioning of the human immune system. The damage to the human immune system eventually leaves the affected individual increasingly susceptible to certain opportunistic diseases. AIDS is fatal, and presently there is no cure. *See, e.g.,* Jay A. Levy, *Human Immunodeficiency Viruses and the Pathogenesis of AIDS,* 261 JAMA 2997 (1989) (explaining how HIV infects human cells); U.S. Public Health Service, Sur-

geon General's Report on Acquired Immune Deficiency Syndrome (1987).

2. T.M.W. alleges it is unclear whether the district court dismissed her claims pursuant to Minn. R.Civ.P. 12 or Minn.R.Civ.P. 56. The court of appeals applied the standard of review for summary judgment because the district court considered and used resource materials beyond the pleadings. Minn.R.Civ.P. 56.03. We agree and apply the standard of review for summary judgment on this appeal.

1203, C5–93–1306, C4–93–1328, 1993 WL 515825 (Minn.App. Dec. 14, 1993). The court of appeals reversed the district court with respect to all of T.M.W.'s claims, permitting T.M.W.'s claims for negligent and intentional infliction of emotional distress, battery, negligent nondisclosure, and consumer fraud. The court of appeals also limited as a matter of law plaintiffs' emotional distress damages to "a reasonable window of anxiety" between the time they learned of Dr. Benson's illness until they received negative HIV test results. This appeal followed.

While this matter was pending in this court, all but one of the plaintiffs ultimately settled their claims against defendants; only plaintiff T.M.W. remains. *K.A.C. v. Benson*, No. C6–93–1203, C5–93–1306, C4–93–1328, 1994 WL 667662 (Minn. Oct. 14, 1994) (order dismissing remaining claimants). We reverse the decision of the court of appeals, and reinstate summary judgment in favor of defendants.

Dr. Philip Benson was a family practitioner at the Palen Clinic and the Palen Heights Clinic from 1980 until June 1991. Early in 1989, Dr. Benson began losing weight while following a weight control program. In March 1989, he developed a series of skin conditions on his face, hands, arms, and head. Initially, Dr. Benson self-treated these conditions. In early 1990, Dr. Benson consulted a dermatologist who diagnosed a variety of skin disorders, including vitiligo, *alopecia areata*, and folliculitis.

In June 1990, Dr. Benson developed nodular lesions on his hands and forearms. In September 1990, Dr. Benson consulted another dermatologist who diagnosed the lesions as exudative dermatitis (*Mycobacterium marinum*) and ordered an HIV test. Dr. Benson tested HIV seropositive. Dr. Benson's dermatologist reported Dr. Benson's HIV seropositive status to the Minnesota Department of Health, and in October 1990 Dr. Benson met with the Minnesota Board of Medical Examiners (Board) regarding his medical practice. At that time, the Board had no formal guidelines regarding HIV seropositive health-care providers.[3] The Board advised Dr. Benson to wear two pairs of gloves when caring for patients and to refrain from performing surgery. He complied with the Board's requirements, and voluntarily ceased delivering babies.

After meeting with the Board, Dr. Benson performed two gynecological exams on T.M.W. during the time he suffered from dermatitis: the first in late October 1990, the second in early January 1991. By the end of 1990, Dr. Benson's dermatitis condition had significantly healed.

After Dr. Benson performed the second gynecological exam on T.M.W. in January 1991, Dr. Benson again met with the State Board of Medical Examiners.[4] As a result of that meeting Dr. Benson entered into a Stipulation and Order with the Board, restricting him from delivering babies, from performing surgery, or performing invasive procedures using a sharp instrument in a patient's body cavity.

In May 1991 the State Board of Medical Examiners and the Minnesota Department of

---

3. The United States Department of Health and Human Services Centers for Disease Control (CDC) issues voluntary health-care worker guidelines designed to prevent transmission of HIV between health-care workers and patients during invasive medical or dental procedures. In 1987, CDC recommended that all health-care workers with exudative dermatitis, regardless of their HIV status, refrain from direct patient contact. *See, e.g., Recommendations for Prevention of HIV Transmission in Health–Care Settings*, 36 Morbidity & Mortality Wkly.Rep. (CDC) 2S, 6S (1987). The CDC also recommends that decisions regarding restrictions on HIV-infected health-care workers occur on an individual basis. *Id.* at 16S.

In July 1991, 1 month after Dr. Benson ceased practicing medicine, the CDC issued guidelines designed to govern the practice of HIV-infected health-care workers. *See Recommendations for Preventing Transmission of Human Immunodeficiency Virus and Hepatitis B Virus to Patients During Exposure–Prone Invasive Procedures*, 40 Morbidity & Mortality Wkly. Rep. (CDC), RR–8, 1–9 (1991).

4. In that same month, the Minnesota State Board of Medical Examiners first established a Task Force to assist them in formulating a policy with respect to HIV-infected physicians. Controversy over the proposed Minnesota guidelines ensued, and the Minnesota Medical Association could not ratify a position on the issue. *See* Minnesota Board of Medical Examiners Update (Spring 1991).

Health contacted 336 patients on whom Dr. Benson performed one or more invasive procedures while gloved, but at a time when he suffered from exudative dermatitis. The letter, dated June 17, 1991 and signed by Dr. Benson, stated in relevant part as follows:

> Under most conditions there would be no reason to alert you [of Dr. Benson's AIDS diagnosis] since current recommendations suggest that physicians infected with the AIDS virus pose little or no risk to their patients. However, between May 1, 1990 and February 21, 1991, I had a skin rash on my hands and fingers. I am sending you this letter because there is a very minimal possibility that you were exposed to the AIDS virus through body fluids from this rash during certain medical procedures. At the time that I had this rash, I did not realize that there may have been any risk to you because I was wearing gloves. I am now aware that even with gloves, an extremely minimal risk still existed.
>
> Based on the most current information about AIDS and the opinions of many experts, the likelihood that you have been infected with the AIDS virus from this type of exposure is *extremely low*. However, for your peace of mind and absolute safety, I am recommending that you be tested for antibody to the AIDS virus. This test will tell us whether or not you are infected with the AIDS virus. Because people generally have no symptoms when they first become infected with the AIDS virus, it is important for you to be tested.
> \* \* \* \*

(Letter from Dr. Benson of June 17, 1991) (emphasis in original). Following receipt of Dr. Benson's letter, over 50 former patients commenced individual actions against Dr. Benson and the Palen Clinic for various claims. None of the 325 patients tested HIV seropositive.[5]

Dr. Benson ceased his medical practice in June 1991. He died of AIDS-related complications in September 1991.

**T.M.W.'s Claims**

### a. Negligent Infliction of Emotional Distress

■ The first issue presented on appeal is whether plaintiff must allege actual exposure to the body fluids of an HIV-infected individual to recover emotional distress damages. To establish a claim for negligent infliction of emotional distress, plaintiff must show she: (1) was within a zone of danger of physical impact; (2) reasonably feared for her own safety; and (3) suffered severe emotional distress with attendant physical manifestations. *Stadler v. Cross*, 295 N.W.2d 552, 553 (Minn.1980). T.M.W. argues that although she cannot prove actual exposure to HIV occurred, it is possible she was exposed to a body fluid transfer. Thus, T.M.W. in effect alleges her proximity to Dr. Benson's HIV-infected body fluids put her within the "zone of danger" of physical impact. She offers the affidavit of Dr. Sanford Kuvin, who would testify that gloves are inadequate protection against HIV transmission. We are not persuaded by this argument, and hold, as a matter of law, for the reasons stated hereafter, that plaintiff was beyond the "zone of danger" for purposes of a claim of negligent infliction of emotional distress.

In *Purcell v. St. Paul City Ry. Co.*, 48 Minn. 134, 50 N.W. 1034 (1892), this court first ruled that actual physical impact is not

---

5. Of the 336 patients notified, 325 obtained HIV tests, three refused testing, seven could not be located, and one had died of causes unrelated to AIDS. *See also* Richard N. Danila et al., *A Look-Back Investigation of Patients of an HIV–Infected Physician*, 325 New Eng.J.Med. 1406 (1991) (case study documenting incidents giving rise to this litigation).

Scientists have developed a medically reliable test for the presence of an antibody produced by individuals who have contracted HIV. Blood tests for detection of HIV are extremely accurate. Two antibody tests exist: a screening enzyme-linked immunosorbent assay (ELISA) test (or en-zyme immunoassay test (EIA)), and a second confirmatory test called a Western Blot. Used together, these tests are more than 99.0 percent accurate. *Ninety-five percent of HIV-infected individuals will test HIV positive within 6 months of the date of viral transmission.* After an individual tests positive for HIV, there may be a latency period of several years before physical symptoms of AIDS develop. An AIDS diagnosis is made when an individual tests seropositive for HIV and has a severely compromised immune system as a result of the virus, or contracts one or more opportunistic diseases.

necessary to sustain a claim for emotional distress damages. There, plaintiff suffered a miscarriage after the cable car on which she was a passenger narrowly avoided a collision with another cable car. *Id.* The court adopted the "zone of danger" test, noting the impending cable car collision "seemed so imminent, and was so nearly caused, that the incident and attending confusion of ringing alarm-bells and passengers rushing out of the car caused to plaintiff sudden fright and reasonable fear of immediate death or great bodily injury * * *." *Id.* The zone of danger test has remained the law in Minnesota for over 100 years.

We adhered to the "zone of danger" test in *Okrina v. Midwestern Corp.*, 282 Minn. 400, 401, 165 N.W.2d 259, 261 (1969), where plaintiff was in a dressing room at a J.C. Penney store when "she heard what sounded like a bomb and witnessed the collapse of the wall." *Id.* Plaintiff ultimately escaped "without being physically struck by debris other than dust." *Id.* This court held that plaintiff was within the zone of danger. The court of appeals applied the "zone of danger" test in *Quill v. Trans World Airlines, Inc.*, 361 N.W.2d 438 (Minn.App.1985), *pet. for rev. denied*, (Minn., Apr. 18, 1985), where the aircraft on which plaintiff was a passenger suddenly rolled and plunged toward the earth. *Id.* at 440. The pilot regained control of the craft only seconds before it would have struck the ground. *Id.; see also Silberstein v. Cordie*, 474 N.W.2d 850, 852–53 (Minn. App.1991) (family was within zone of danger when family member murdered in adjacent room).

■ This court has limited the zone of danger analysis to encompass plaintiffs who have been in some actual personal physical danger caused by defendant's negligence. *Langeland v. Farmers State Bank of Trimont*, 319 N.W.2d 26, 31 (Minn.1982); *see also Leaon v. Washington County*, 397 N.W.2d 867, 875 (Minn.1986). Whether plaintiff is within a zone of danger is an objective inquiry. *Stadler*, 295 N.W.2d at 554.

Thus, cases permitting recovery for negligent infliction of emotional distress are characterized by a reasonable anxiety arising in the plaintiff, with attendant physical manifestation, from being in a situation where it was abundantly clear that plaintiff was in grave personal peril for some specifically defined period of time. Fortune smiled and the imminent calamity did not occur. Here, the situation is quite different. The facts as alleged by T.M.W. indicate that Dr. Benson's actions never did place T.M.W. in "apparent, imminent peril" of contracting HIV because she was not actually exposed to the AIDS virus. *Purcell*, 48 Minn. at 138, 50 N.W. at 1035. Transmission of HIV from Dr. Benson to plaintiff was, fortunately, never more than a very remote possibility.

That T.M.W.'s risk of contracting HIV was no more than a remote possibility is acknowledged by the numerous resource materials referred to by the district court and the parties. HIV is transmitted through direct fluid-to-fluid contact with the blood, semen, vaginal secretions, or breast milk of an HIV-infected individual.[6] While other body fluids may contain HIV, the virus apparently is not transmitted by other fluids.

> Documented modes of HIV transmission include: unprotected sexual intercourse with an HIV-infected person; using contaminated needles; contact with HIV-infected blood, blood components, or blood products by parenteral mucous membrane or nonintact skin; transplants of HIV-infected organs and/or tissues; transfusions of HIV-infected blood; artificial insemination of HIV-infected semen; and perinatal transmission from mother to child around the time of birth.[7]

Ninety-nine percent of reported AIDS cases are transmitted by sexual intercourse, intra-

---

6. *See Update: Universal Precautions for Prevention of Transmission of Human Immunodeficiency Virus, Hepatitis B Virus, and Other Bloodborne Pathogens in Health Care Settings*, 37 Morbidity & Mortality Wkly.Rep. (CDC) 377, 378–79 (1988).

7. Garry G. Mathiason & Steven B. Berlin, *AIDS in the Healthcare, Business, and Governmental Workplace*, C902 ALI–ABA 731, 737 (1994).

venous drug abuse, or perinatal transmission.[8]

■■■ This court has long recognized that a person within the zone of danger of physical impact who reasonably fears for his or her own safety during the time of exposure, and who consequently suffers severe emotional distress with resultant physical injury, may recover emotional distress damages whether or not physical impact results. *Purcell*, 48 Minn. 134, 50 N.W. 1034. However, a remote possibility of personal peril is insufficient to place plaintiff within a zone of danger for · purposes of a claim of negligent infliction of emotional distress. Consequently, we hold that a plaintiff who fails to allege actual exposure to HIV is not, as a matter of law, in personal physical danger of contracting HIV, and thus not within a zone of danger for purposes of establishing a claim for negligent infliction of emotional distress.

The actual exposure requirement we adopt today is consistent with the court's historical caution regarding emotional distress claims. Concerns about unintended and unreasonable results prompted this court to limit negligent infliction of emotional distress claims to persons who experienced personal physical danger as a result of defendant's negligence. We determined the "zone-of-danger rule" would lead to reasonable and consistent results because courts and juries can objectively determine whether plaintiffs were within the zone of danger. *Stadler*, 295 N.W.2d at

554. The standard we adopt today, requiring a plaintiff to allege actual exposure to HIV as a predicate to recovery, retains the objective component this court has long deemed necessary to ensure stability and predictability in the disposition of emotional distress claims.

We also find persuasive several policy considerations articulated by the California Court of Appeals on remand in *Kerins v. Hartley (Kerins II )*, 27 Cal.App.4th 1062, 33 Cal.Rptr.2d 172 (1994).

The magnitude of the potential class of plaintiffs seeking emotional distress damages for negligent exposure to HIV or AIDS cannot be overstated. * * * "[t]he devastating effects of AIDS and the widespread fear of contamination at home, work, school, healthcare facilities and elsewhere are, sadly, too well known to require further discussion at this point." Proliferation of fear of AIDS claims in the absence of meaningful restrictions would run an equal risk of compromising the availability and affordability of medical, dental and malpractice insurance, medical and dental care, prescription drugs, and blood products. Juries deliberating in fear of AIDS lawsuits would be just as likely to reach inconsistent results, discouraging early resolution or settlement of such claims. Last but not least, the coffers of defendants and their insurers would risk being emptied to pay for the emotional suffering

---

**8.** *See, e.g.,* John G. Bartlett, *HIV Infection and Surgeons,* 29 Current Problems in Surgery 199, 202 (April, 1992).

To date, there are no known cases of HIV transmission from a physician to a patient. *See, e.g.,* Jeffrey J. Sacks, *AIDS In a Surgeon,* 313 New Eng.J.Med. 1017–18 (1985) (study of 400 patients of surgeon with AIDS); Armstrong et al., *Investigation of a Health Care Worker with Symptomatic Human Immunodeficiency Infection: An Epidemiologic Approach,* 152 Military Med. 414–18 (1987) (study of 1,804 patients of a military surgeon with AIDS); John D. Porter et al., *Management of Patients Treated by Surgeon with HIV Virus Infection,* 335 The Lancet 113–14 (1990) (study of 339 patients of a British surgeon with AIDS); Ban Mishu et al., *A Surgeon with AIDS: Lack of Evidence of Transmission to Patients,* 264 JAMA 467–70 (1990) (study of 2,160 patients of a Nashville surgeon with AIDS); *but see Update: Transmission of HIV Infection During an Invasive Dental Procedure—Florida,* 40 Morbidity & Mortality Wkly. Rep. (CDC) No. 2, 21–26 (1991).

Even if a person is exposed to HIV-infected body fluids or tissues, transmission of HIV may not necessarily occur. The theoretical risk of HIV transmission from an infected health-care worker to a patient during invasive procedures is minute. Indeed, "a modeled risk estimation by the CDC was that transmission could occur in one of 2.4 million to one of 24 million surgical procedures." *See* The AIDS Knowledge Base 2.1–8 (P.T. Cohen et al. eds., 2d ed. 1994). In 1991, the CDC estimated the theoretical risk of HIV transmission from an HIV-infected patient to a health-care worker following actual percutaneous exposure to HIV-infected blood is approximately 0.3 percent per exposure. *See Recommendations for Preventing Transmission of Human Immunodeficiency Virus and Hepatitis B Virus to Patients During Exposure–Prone Invasive Procedures,* 40 Morbidity & Mortality Wkly. Rep. (CDC), RR–8, 3 (1991).

of the many plaintiffs uninfected by exposure to HIV or AIDS, possibly leaving inadequate compensation for plaintiffs to whom the fatal AIDS virus was actually transmitted.

*Kerins II,* 33 Cal.Rptr.2d at 178–79 (citations omitted).

▆▆▆ Although our decision is based upon existing Minnesota case law, we note that it is consistent with the majority of jurisdictions that have addressed the issue of emotional distress damages arising from a plaintiff's fear of contracting HIV. The majority of courts that have decided fear of HIV exposure cases hold the plaintiff must allege actual exposure to HIV to recover emotional distress damages.[9] We concur with the majority of jurisdictions and reject plaintiff's claim in this case. In an action for damages based solely upon plaintiff's fear of acquiring AIDS, without allegation of actual exposure to HIV, no legally cognizable claim exists under Minnesota law. Accordingly, we reverse the court of appeals decision and reinstate summary judgment in favor of defendants, Dr. Philip Benson and the Palen Clinic.

**b. Intentional Infliction of Emotional Distress**

▆▆▆ To sustain a claim for intentional infliction of emotional distress, plaintiff must establish: (1) the conduct was extreme and outrageous; (2) the conduct was intentional or reckless; (3) it caused emotional distress; and (4) the distress was severe. *Hubbard v. United Press Int'l, Inc.,* 330 N.W.2d 428, 438–39 (Minn.1983). The actor must intend to cause severe emotional distress or proceed with the knowledge that it is substantially certain, or at least highly probable, that severe emotional distress will occur. *Dornfeld v. Oberg,* 503 N.W.2d 115, 119 (Minn.1993). Here, the court of appeals focused on the "extreme and outrageous conduct" element and concluded that a factual dispute existed with regard to Dr. Benson's conduct.

▆▆▆ The undisputed facts show that upon learning of his HIV seropositive status Dr. Benson sought guidance from the Minnesota State Board of Medical Examiners regarding his medical practice. When Dr. Benson treated T.M.W. he complied with the restrictions imposed by the Minnesota Board of Medical Examiners pursuant to the October 1990 meeting. There is no evidence Dr. Benson either knew of or recklessly disregarded a known risk to T.M.W., nor in fact did Dr. Benson actually pose any reasonable risk of exposing T.M.W. to the AIDS virus. Consequently, we hold that T.M.W. failed to establish that Dr. Benson's conduct was either intentional or reckless for purposes of meeting the *Dornfeld* test. *Dornfeld,* 503 N.W.2d at 119.

9. *See, e.g., Burk v. Sage Products, Inc.,* 747 F.Supp. 285, 287 (E.D.Pa.1990); *Kerins II,* 33 Cal.Rptr.2d 172; *Brzoska v. Olsen,* 1994 WL 233866 (Del.Super.Ct. May 2, 1994); *Doe v. Surgicare of Joliet, Inc.,* No. 3–93–0765, 1994 WL 461796, (Ill.App.Ct. Aug. 25, 1994); *Ordway v. County of Suffolk,* 154 Misc.2d 269, 583 N.Y.S.2d 1014 (Sup.Ct.1992); *Doe v. Doe,* 136 Misc.2d 1015, 519 N.Y.S.2d 595 (Sup.Ct.1987); *Lubowitz v. Albert Einstein Med. Ctr.,* 424 Pa.Super. 468, 623 A.2d 3 (1993); *Carroll v. Sisters of St. Francis Health Serv., Inc.,* 868 S.W.2d 585, 594 (Tenn. 1993); *Funeral Serv. By Gregory, Inc. v. Bluefield Community Hosp.,* 186 W.Va. 424, 413 S.E.2d 79 (1991), *overruled on other grounds, Courtney v. Courtney,* 190 W.Va. 126, 437 S.E.2d 436 (1993); *Johnson v. West Virginia Univ. Hosp.,* 186 W.Va. 648, 413 S.E.2d 889, 894 (1991).

Indeed, Maryland is the only jurisdiction in which the highest court permits recovery when a plaintiff alleges potential exposure to the AIDS virus, absent either a proven channel of exposure or a positive HIV test. *See Faya v. Almaraz,* 329 Md. 435, 620 A.2d 327, 333 (1993). A few trial courts have also employed this test. *See, e.g., Castro v. New York Life Ins.,* 153 Misc.2d 1, 588 N.Y.S.2d 695, 697 (Sup.Ct.1991) (janitor pricked by discarded needle permitted to pursue claim based on "reasonable fear" test); *Marchica v. Long Island R.R.,* 810 F.Supp. 445 (E.D.N.Y. 1993) (permitting claim for emotional damages under Federal Employers' Liability Act (FELA), 45 U.S.C. § 51–60), *aff'd,* 31 F.3d 1197 (2d Cir. 1994), *cert. denied,* — U.S. ——, 115 S.Ct. 727, 130 L.Ed.2d 631 (1995). However, FELA provides a more relaxed negligence standard that common law negligence actions, and at least one court suggests *Castro* "may be an aberration in New York law" because the general trend in New York requires actual exposure. *See Carroll,* 868 S.W.2d at 592 n. 15; *see also Kaehne v. Schmidt,* 163 Wis.2d 524, 472 N.W.2d 247 (Ct. App.) (allowing damages for fear of AIDS exposure resulting from unscreened blood transfusion until plaintiff received negative HIV test), *rev. denied,* 474 N.W.2d 107 (1991).

## c. Battery

T.M.W.'s claim for battery is predicated on her assertion that Dr. Benson's nondisclosure of his HIV status vitiated any initial consent to medical care because she would not have consented to treatment by Dr. Benson had she known he was infected with HIV. T.M.W. alleges she asked Dr. Benson about his weight loss and the sores on his hands and arms, and that Dr. Benson told her the sores resulted from a sunburn he received while on vacation. The weight loss was due to a weight control program.

The district court held that plaintiff could not sustain her battery claim absent allegations of actual exposure to HIV. The court of appeals reversed, adopting the reasoning of the California Court of Appeals in *Kerins I*, which was subsequently vacated and reversed on remand. *Kerins v. Hartley*, 17 Cal.App.4th 713, 21 Cal.Rptr.2d 621 (1993), *vacated*, 868 P.2d 906 (Cal.), *rev'd on reh'g*, 27 Cal.App.4th 1062, 33 Cal.Rptr.2d 172 (1994).

 In medical malpractice claims, battery consists of touching of a substantially different nature and character from that to which the patient consented. *Kohoutek v. Hafner*, 383 N.W.2d 295, 299 (Minn.1986). For example, in *Mohr v. Williams*, 95 Minn. 261, 104 N.W. 12 (1905), plaintiff's consent to surgery on her right ear did not authorize her doctor to operate on the left ear. A claim of battery also lies when a doctor fails to disclose a very material aspect of the nature and character of a procedure to be performed, because any supposed consent is undermined and thus an unpermitted touching occurs. *Bang v. Charles T. Miller Hosp.*, 251 Minn. 427, 88 N.W.2d 186 (1958). However, a patient's consent is not rendered void when the patient is touched in exactly the way she consented. *Kohoutek*, 383 N.W.2d at 299.

 T.M.W. does not allege that Dr. Benson performed a different procedure from that to which she consented. Moreover, because Dr. Benson's conduct did not significantly increase the risk that T.M.W. would contract HIV, it cannot be said that Dr. Benson failed to disclose a material as-

pect of the nature and character of the procedure performed. Consequently, plaintiff's battery claim must fail.

## d. Negligent Nondisclosure

The court of appeals reversed the summary judgment as to T.M.W.'s claim of negligent nondisclosure, holding that plaintiff had indeed stated a claim for relief.

 A claim for negligent nondisclosure focuses on a doctor's duty to inform patients of the risks attendant upon certain medical procedures. *Cornfeldt v. Tongen (Cornfeldt I )*, 262 N.W.2d 684, 699 (Minn. 1977). To prevail on a claim for negligent nondisclosure plaintiff must demonstrate that a reasonable person knowing of the risk would not have consented to treatment, and that the undisclosed risk actually materialized in harm. *Kinikin v. Heupel*, 305 N.W.2d 589, 595 (Minn.1981).

 Doctors have a duty to disclose risks of death or serious bodily harm which are a significant probability. *Cornfeldt I*, 262 N.W.2d at 702. A doctor must also disclose risks which a skilled practitioner of good standing in the community would reveal, and to the extent a doctor is aware that a patient attaches a particular significance to risks not generally considered serious enough to require discussion, these too must be discussed. *Kinikin*, 305 N.W.2d at 595 (citing *Cornfeldt v. Tongen (Cornfeldt II )*, 295 N.W.2d 638, 640 (Minn.1980)). Indeed, "[a] peculiar or unfounded fear of cancer on [plaintiff's] part might, if anything, require [defendant] to devote more time discussing its probability with her * * *." *Kinikin*, 305 N.W.2d at 595.

 This court has not yet addressed the issue of physicians' duty to disclose their HIV status to patients, and we do not reach that issue today. Whether or not Dr. Benson had a legal duty to disclose his HIV status to his patients, the breach of a legal duty without compensable damages recognized by law is not actionable. *Purcell*, 48 Minn. 134, 50 N.W. 1034. Here, the undisclosed, minuscule "risk" of HIV exposure did not materialize in harm to plaintiff because T.M.W. tested negative for the HIV anti-

body. Therefore, T.M.W.'s claim for negligent nondisclosure fails.

### e. Consumer Fraud

The final issue presented on appeal is whether T.M.W. properly alleged a claim under the Consumer Fraud Act, Minn.Stat. § 325F.69, subd. 1 (1994). T.M.W. asserts that Dr. Benson prevaricated regarding his HIV status, with the intent that she rely upon his explanation and continue under his care. T.M.W. asserts, and the court of appeals held that § 325F.69, subd. 1 of the Consumer Fraud Act does not limit the damages available to claimant to "pecuniary losses."

The Consumer Fraud Act provides in pertinent part "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise * * * is enjoinable * * * ." Minn.Stat. § 325F.69, subd. 1 (1994). The sale of merchandise includes the sale of services, and a private citizen is entitled to bring a civil action for damages for injuries caused by violation of the Act. Minn.Stat. § 325F.68, subd. 2 (1994); Minn. Stat. § 8.31, subd. 1 (1994); Minn.Stat. § 8.31, subd. 3a (1994).

 Unable to establish an "injury," plaintiff has no basis for recovery under the Consumer Fraud Act, Minn.Stat. § 325F.69, subd. 1 (1994). In so holding we find it unnecessary to reach the question of whether an allegation of pecuniary loss is required under the Consumer Fraud Act, Minn.Stat. § 325F.69, subd. 1 (1994).

For the foregoing reasons we reverse the decision of the court of appeals and reinstate summary judgment in favor of defendants, Dr. Philip Benson and the Palen Clinic.

COYNE, J., took no part.

PAGE, Justice (dissenting).

I respectfully dissent. This case highlights the conflict between a doctor's self-interest in his ability to continue the practice of medicine and the patient's right to full information when determining whether to consent to treatment. In affirming the trial court's summary dismissal of T.M.W.'s negligent nondisclosure and battery claims, I believe the court has misapplied the laws of negligent nondisclosure and battery and ignored the patient's rights. In ignoring the patient's rights, the court excludes from "the decision-making process the most critical participant—the patient." *Estate of Behringer v. Medical Center at Princeton,* 249 N.J.Super. 597, 592 A.2d 1251, 1278 (Ct. Law Div.1991).

"[A] failure by a physician to disclose a risk that may arise in the course of a medical procedure or treatment constitutes negligence." *Kohoutek v. Hafner,* 383 N.W.2d 295, 299 (Minn.1986). When we first recognized the negligent nondisclosure claim, in *Cornfeldt v. Tongen,* 262 N.W.2d 684, 701 (Minn.1977) (*Cornfeldt I*), we declined to provide a definite standard for the scope of risks subject to disclosure. Instead, we advanced two rules that were subject to later refinement: physicians had a duty to disclose (1) risks of death or serious bodily harm and (2) risks that would be disclosed by a skilled practitioner of good standing under similar circumstances. *Id.* at 702 (quoting *Cobbs v. Grant,* 8 Cal.3d 229, 104 Cal.Rptr. 505, 515, 502 P.2d 1, 11 (1972)). At the time, we felt those rules adequately insured patients would receive enough information to allow them to exercise their right to self-determination without placing unreasonable disclosure requirements on physicians. *Id.* at 701–02.

The rules were refined three years later when *Cornfeldt* was again before the court. In *Cornfeldt v. Tongen,* 295 N.W.2d 638, 640 (Minn.1980) (*Cornfeldt II*), we broadened and defined the risks which physicians have a duty to disclose to their patients:

[To make out a claim for negligent nondisclosure, the plaintiff must] show a duty to disclose the risk * * * by evidence establishing that a reasonable person in what the physician knows or should have known to be the patient's position would likely attach significance to that risk * * * in formulating his decision to consent to treatment.

*Id.* We footnoted the following explanation of this rule:

> To the extent that our prior opinion suggests that a physician's duty to disclose extends only to significant risks, *i.e.,* death or serious harm, it is hereby modified. Further consideration of the standard of disclosure has led us to the conclusion that *the above-stated objective standard accommodates* professional competence and *patient self-determination.*

*Id.* at n. 2 (emphasis added). We clearly intended to broaden the rule to require physicians to disclose not only risks of death or serious bodily harm, but *any* risk, regardless of the medical profession's opinion of it, that a reasonable patient in the plaintiff's position would find significant.

One year later, in *Kiniken v. Heupel,* 305 N.W.2d 589, 595 (Minn.1981), we indicated that the risks subject to mandatory disclosure include (1) risks of death or serious bodily harm which are of significant probability, (2) risks which a skilled practitioner of good standing in the community would reveal, and (3):

> [T]o the extent a doctor is or can be aware that his patient attaches particular significance to risks not generally considered by the medical profession serious enough to require discussion with the patient, these too must be brought out. In determining whether risks of particular importance to the patient existed and whether his physician should have been aware of their importance, a jury must look to what a reasonable person in what the physician knows or should have known to be the plaintiff's position would consider significant when contemplating [the procedure].

As the court itself notes, "[a] peculiar or unfounded fear * * * on [plaintiff's] part might, if anything, require [defendant] to devote more time discussing its probability with her * * *." Op. at 561 (*quoting Kinikin,* 305 N.W.2d at 595). The reasoning behind this rule is obvious: patients not only have the right to information about actual and substantial risks to their health, but they also have the right to information about risks they consider personally important to their health. In the negligent nondisclosure con-text, the patient's fear for her safety need only have been subjectively reasonable. Thus, the patient's "peculiar" fears, when the physician knows or should know of them, create a duty of disclosure on the physician regarding those fears. *Kinikin,* 305 N.W.2d at 595. The heightened burden this places on physicians insures that the patient receives enough information to meaningfully exercise the right to self-determination in matters of medical treatment. *See, e.g., Estate of Behringer v. Medical Center at Princeton,* 249 N.J.Super. 597, 592 A.2d 1251, 1278 (Ct.Law Div.1991).

Here, it is evident that there is an issue of fact for the jury as to whether Benson should have known T.M.W. attached particular significance to the risk of disease transmission from his open and weeping wounds. It is equally evident that the jury should decide whether a reasonable person, in her position, would have shared her fear.

To prevail, however, a plaintiff must also prove proximate cause: "first, that had a reasonable person known of the risk he would not have consented to treatment; and second, that the undisclosed risk materialized in harm." *Kinikin,* 305 N.W.2d at 595. Both the trial court and this court conclude that T.M.W. is unable to meet the second element of proximate cause.

With regard to the first element, there is an issue of fact as to whether a reasonable person aware of the risk would have consented to the gynecological examinations. Even if it was common knowledge among medical professionals that the risk of HIV transmission under the circumstances presented here was low, it probably was not common knowledge among the general public. Further, the fact that there was a low risk of transmission does not mean that there was no risk. Despite the low risk, the severe consequences of transmittal might have caused a reasonable person to seek treatment from another physician. Thus, a jury could conclude that a reasonable person, informed of the risk of HIV transmission, would not have consented to the treatment.

With regard to the second element of proximate cause, T.M.W. has raised a jury ques-

tion as to whether the undisclosed risk of transmission materialized in harm. It has been the law in Minnesota since at least 1981 that a physician must disclose risks of treatment which he knows or should know are considered significant by the patient, even if the physician and other medical professionals consider the risk insignificant. *Kinikin*, 305 N.W.2d at 595. The harm avoided by such disclosure is emotional distress on the part of the patient—either because the physician explains away the cause of worry, or because the patient does not consent to the treatment. Here, emotional distress is precisely the harm T.M.W. claims she suffered because of Benson's nondisclosure. Thus, I believe it was error to affirm the trial court's grant of summary judgment dismissing T.M.W.'s negligent nondisclosure claim.

"[A] claim of battery lies against a physician who performs a medical procedure on a patient without his or her consent." *Kohoutek v. Hafner*, 383 N.W.2d 295, 298 (Minn. 1986). Even where the physician has apparently gained consent, however, "[u]nder some circumstances * * * the patient's consent can be vitiated." *Id.* at 299. *See* W. Page Keeton, et al., Prosser and Keeton on Torts § 18, at 114 (5th ed. 1984) (noting consent can be void, for example, where there is incapacity, coercion, mistake, or fraud).

One such circumstance is when the consent is obtained through misrepresentation or fraud. Restatement (Second) of Torts § 892B(2) (1977) provides:

> If the person consenting to the conduct of another is induced to consent by a substantial mistake concerning the nature of the invasion of his interests or the extent of the harm to be expected from it and the mistake is known to the other or is induced by the other's misrepresentation, the consent is not effective for the unexpected invasion or harm.

When T.M.W. consented to the gynecological examinations, she clearly did not anticipate any risk of HIV transmission. Nor did she anticipate suffering the emotional distress caused by her concern for contracting HIV from the examinations. It is a jury question as to whether T.M.W.'s consent to the gynecological examinations was induced

by Dr. Benson's misrepresentations concerning his health.

The court's holding today, without discussing the issue, apparently forecloses a plaintiff's battery claim where the plaintiff consents to the touching due to a defendant's misrepresentations.