**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

---

No. 96-4046

---

Aja M. Crist, Catherine E. Miskowic,    *
Tracy J. Elbers,                          *
                                          *
          Appellants,                     *
                                          * Appeal   from   the   United
States
          v.                              * District Court for the
                                          * District of Minnesota.
Focus Homes, Incorporated, a              *
Minnesota corporation; Focus Homes        *
Corporation, a Minnesota corporation,     *
                                          *
          Appellees.                      *

---

Submitted:  June 11, 1997

Filed:   August 15, 1997

---

Before  MURPHY,  HEANEY,  and  JOHN  R.  GIBSON,  Circuit
Judges.

---

HEANEY, Circuit Judge.

     This  appeal  presents  the  question  whether  a
residential  program  for  developmentally  disabled
individuals may be found liable for sexual harassment due
to its failure to respond appropriately to the conduct of
a  mentally  incapacitated  resident  toward  program
employees.  We conclude that such a claim is cognizable
under Title VII and the Minnesota Human Rights Act.
Accordingly, we reverse the district court's

grant of summary judgment for Focus Homes, Inc. and Focus Homes Corp. (collectively "Focus Homes") on the sexual harassment claim and remand for further proceedings. In all other respects,[1] we affirm the district court.

I.

We state the facts in the light most favorable to the appellants, Aja M. Crist, Catherine E. Miskowic, and Tracy J. Elbers, as is appropriate on review of a grant of summary judgment. Crist, Miskowic, and Elbers were employees of Focus Homes, a for-profit organization that operates over fifty residential programs for individuals with developmental disabilities. In November 1994, Focus Homes opened a new facility called Yates House, which provided services for four individuals, all of whom were diagnosed with mental retardation and autism. Focus Homes assigned the appellants to Yates House when it opened. They were responsible for providing direct care to the residents. In addition, Miskowic was the manager of the facility, in charge of hiring and supervising staff, Elbers was the assistant manager, and Crist held the position of lead program staff, occasionally supervising staff on the weekends.

One of the four residents at Yates House, J.L., was sixteen years old when he moved into the facility. He

---

[1]The appellants brought additional claims against their employer, of which the following remain on appeal: aiding and abetting sexual harassment, retaliatory discharge, and infliction of emotional distress. For the reasons we state briefly at the conclusion of the opinion, we agree with the district court that summary judgment for Focus Homes was appropriate with respect to these claims.

functioned at the level of a two-to-five-year-old child, was nonverbal, and required significant direct personal care. Physically, he stood over six feet tall and weighed more than two hundred pounds. Almost immediately after he arrived at Yates House, J.L. displayed physical aggression toward the staff and other residents. According to the reports filled out by the staff, on November 4, 1994, J.L. pulled at Elbers' shirt and bra, looked down her shirt, and attempted to rub his body

against hers.  On November 7, he grabbed a male resident's penis and otherwise physically attacked him. On November 8, he pushed Crist against a door, forced her right hand above her head, pulled open her jeans and her blouse, grabbed her left breast, and pushed his weight and erect penis against her stomach.  After Crist successfully pushed J.L. off of her, he continued to hit her and other staff members, pulled at their clothing, and threw a clock at them.[2]

That evening, Miskowic reported the November 8th incident to her supervisor, Michael Maniaci.  The next day she went to Focus Homes' corporate offices where she reported J.L.'s assaultive behavior and arranged for an instructor to come to Yates House immediately to provide additional physical intervention training.  That afternoon, Maniaci came to Yates House and, after reviewing the incident reports, he returned some of them to Miskowic for clarification because he found them confusing.  He also informed Miskowic that he had canceled the instruction session she had arranged and instead scheduled a meeting for November 14th with Focus

_____

[2]In its brief, Focus Homes minimizes J.L.'s conduct and offers a different account of these events:

> Through it all, there is no indication that J.L. was acting violently.  Elbers, who arrived immediately after Crist freed herself, noted that J.L. did not appear angry or agitated and no further physical intervention was necessary.  Notably, this was an isolated incident; Crist never observed J.L. exhibit this specific behavior before or after November 8.

(Appellee's Br. at 6 (citations to the record omitted).)  At this juncture, however, we accept the facts as stated by the appellants.

4

Homes' behavioral consultant, Bruce Barthel-Wagner.

At the November 14th meeting, appellants informed Barthel-Wagner and Maniaci of J.L.'s behavior. In the interim week, his aggressive conduct continued, including an incident in which he had knocked Crist unconscious. Appellants testified

in their depositions that Barthel-Wagner responded to their concerns by "leering" at Crist's breasts and commenting, "Well, come on, he's a breast man."[3] From this comment, the appellants believed that their complaints were not being taken seriously and felt that they lacked any support whatsoever from Focus Homes. The record supports that Barthel-Wagner suggested alternative methods for redirecting J.L.'s behavior. He determined that J.L. needed a written behavior program, which would instruct staff how to react to J.L. to reinforce his positive behavior and to replace his maladaptive behaviors. Maniaci also stated that he would develop a safety plan for Yates, which would include a sexuality assessment. It is unclear from the record, however, when or even if Focus Homes implemented the behavior or safety plan. Elbers stated in her affidavit that upper management repeatedly assured her that Focus Homes would provide a written behavior program and safety plan for J.L., but that it had done neither before she quit her job in March 1995.

On December 1, 1994, an interdisciplinary team consisting of a county social worker, Focus staff, and J.L.'s family met to assess his first month at Yates House. They discussed his behavior and treatment options, including the possibility of implementing state-

---

[3]Focus Homes contends that it is undisputed that it disciplined Barthel-Wagner as soon as the breast comment was reported to Focus management on February 2, 1997. The appellants contend that because Maniaci attended the November meeting, Focus Homes was aware of the comment immediately and should have done something well before February. Barthel-Wagner denied ever making the comment. Again, we leave the factual disputes as to whether the comment was made and what Focus Homes did in response for the district court to resolve in the appropriate proceeding.

regulated deprivational procedures.  On December 6th, Focus Homes provided the Yates staff with intervention training that specifically addressed J.L.'s behavior and his large physical stature.

The number of reported violent incidents involving J.L. decreased in December, although for part of that time J.L. was away for the holidays.  J.L.'s aggressive conduct

began again in the new year, and the appellants continued to report it. As reported, J.L. attempted to assault another resident in late December, but staff restrained him. In January and February, over thirteen reports involved J.L.'s grabbing of the appellants' breasts, buttocks, or genital areas. He also frequently pulled at their clothing and attempted to undress them. At least three times, he attempted to digitally penetrate Crist. It was also reported that J.L. masturbated frequently and repeatedly exposed himself.

In late January, in response to the appellants' complaints, Focus Homes sent Randy Dietrich to Yates House to discuss J.L.'s escalating behavior with the staff. Dietrich began to work occasionally at the home, providing direct care to J.L. Another male employee also began providing direct care to J.L. in early February. Throughout February, Focus Homes met several times to discuss J.L.'s behavior and treatment options. Because the school had not performed a sexuality assessment of J.L., which was to be part of Maniaci's safety plan, Focus Homes determined that one would be completed by March 1, 1995.

On February 10, 1995, the appellants filed an anonymous claim of neglect regarding J.L. under the Minnesota Vulnerable Adult Act. On the 13th, Focus Homes discovered that the report had been filed. Two days later, Crist was asked to participate in an observation exercise in which she would permit J.L. to grab her so that Focus Homes executives could view the problematic conduct. She refused to participate and instead gave Focus Homes her two-week termination notice. Miskowic

and Elbers gave their notices on February 23rd.

Appellants initiated this lawsuit on November 8, 1995, claiming, <u>inter alia</u>, that Focus Homes' inadequate response to J.L.'s behavior violated both Title VII and the MHRA. Specifically, they claimed that Focus Homes had a duty under both statutes to take prompt and appropriate corrective action to protect them from J.L.'s behavior. Focus Homes moved for summary judgment, arguing that it had no duty to act because

J.L.'s behavior did not constitute sexual harassment and because it could not control his behavior. Focus Homes further argued that even if it did have such a duty, its response to appellants' concerns was timely and appropriate. The district court granted Focus Homes' motion for summary judgment and Crist, Miskowic, and Elbers appeal.

## II.

Contrary to the district court's opinion and Focus Homes' arguments on appeal, the thrust of appellants' lawsuit is Focus Homes' conduct in response to appellants' complaints about J.L.'s physically aggressive behavior, not J.L.'s underlying conduct. The appellants assert that Focus Homes' failure to adequately respond to their concerns regarding J.L.'s behavior constitutes sexual harassment in violation of state and federal law prohibiting employment discrimination based on sex. See 42 U.S.C. § 2000e-2(a)(1); Minn. Stat. § 363.03(2)(c). To prevail on their sexual harassment theory, the appellants must prove that: (1) they are members of a protected group; (2) they were subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take appropriate remedial action. See Callanan v. Runyun, 75 F.3d 1293, 1296 (8th Cir. 1996); Klink v. Ramsey County, 397 N.W.2d 894, 901 (Minn. Ct. App. 1986).

The district court rejected the appellants' claim on two bases. It held that, given the unique set of facts,

particularly J.L.'s severe developmental disabilities, his conduct could not constitute sexual harassment. Even if it did, according to the district court, Focus Homes could not be held responsible for his behavior because it could not control the behavior. Although we recognize that this case proposes a unique application of Title VII and the MHRA, the district court's misplaced emphasis on J.L.'s inability to form intent, rather than on Focus Homes' responsibility to its employees, sweeps too broadly. The court's ruling essentially permits a residential care provider like Focus Homes to tell its employees that they assume the risk of

working with developmentally disabled individuals and that they have no right to expect a safe working environment. On the other hand, strict liability on the part of such employers for the conduct of its residents would simply constitute a swing to the opposite extreme. We believe that the EEOC guidelines and MHRA strike a balance between the two extremes and, correctly applied, preclude the grant of summary judgment in this case.

Under both state and federal law, the definition of sexual harassment includes "physical conduct of a sexual nature" when "submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment" or when "such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." 29 C.F.R. § 1604.11(a)(1), (3); see also Minn. Stat. § 363.01, subd. 41(1), (3) (substantially similar definition). The appellants have presented facts sufficient to support a finding of sexual harassment under the plain language of either definition.

With respect to the first part of the definition, there is little dispute that J.L.'s behavior constituted physical conduct of a sexual nature. A reasonable fact finder could also find that Focus Homes' management did not take the appellants' concerns seriously--as evidenced, for example, by Barthel-Wagner's "breast man" comment--or did little in an attempt to ensure their safety. Crist believed that Focus Homes wanted her to submit to J.L.'s conduct to observe it for themselves. In light of these allegations, a fact finder could

12

characterize Focus Homes' response as implicitly or even explicitly requiring the appellants to endure repeated sexual assaults as an essential part of their job.

The record also supports a finding that the repeated sexual contact by J.L. and the belief that Focus Homes was not going to do anything to stop it unreasonably interfered with the appellants' work performance or created an intimidating, hostile, or

offensive working environment. As the district court acknowledged and the regulations make clear, the actor who engages in the physical conduct need not have the intent to create an abusive working environment. Rather, the focus of sexual harassment cases is primarily on the effect of the conduct. As the Supreme Court has reiterated, the conduct must be sufficiently severe or pervasive to create an environment that a reasonable person would find hostile or abusive and that actually altered the conditions of the victim's employment. See Harris v. Forklift Sys., Inc., 126 L. Ed. 2d 295, 302 (1993). The determination of whether an environment is "hostile" or "abusive" requires particularized consideration of the circumstances, including the frequency of the conduct and its severity, id., and, in this case, the appellants' expectations given their choice of employment.[4] In light of the factual disputes in the record, particularly with respect to the severity of J.L.'s conduct and the effect that it had on the appellants, this fact-intensive determination should be made by a fact finder after a full trial.

Although the district court did not reach this element, a reasonable jury could also find that J.L.'s conduct was based on sex. Although he did act out

---

[4]In its amicus brief, the Association of Residential Resources in Minnesota argues that the appellants' interpretation of the law will lead to absurd results. For example, it suggests that a health care professional hired to care for an individual with Tourette's Syndrome could later sue for sexual harassment because of sexually explicit language the patient repeatedly uttered. We disagree. The appellants do not seek a blanket rule that all sex-related conduct on the job necessarily constitutes sexual harassment. Rather, consistent with our holding today, they argue that sexual harassment cases are necessarily fact-intensive and must be decided on a case-by-case basis with proper consideration of all relevant facts.

against a male resident, his aggression was directed primarily at female employees; in fact, when male care providers began working at Yates House, the incidents of abuse were less frequent.  Again, it may be argued that J.L. had no intent to target women, but a finding that his conduct disproportionately affected female staff could support a determination that the harassment was based on sex.  See Kopp v. Samaritan Health Sys., Inc., 13

F.3d 264, 269 (8th Cir. 1993) (where record supported incidents of abuse primarily involved women, if proven at trial, plaintiff could prevail on claim that conduct was gender-based).

If a fact finder were to determine that J.L.'s conduct constituted sexual harassment based on sex, it must then address whether Focus Homes was aware of the conduct and failed to respond appropriately. Given the numerous incident reports filed by the appellants, Focus Homes undoubtedly was aware or should have been aware of J.L.'s behavior. Focus Homes' liability thus turns again on a fact-intensive consideration, this time whether Focus Homes' response was immediate or timely and appropriate in light of the circumstances, particularly the level of control and legal responsibility Focus Homes has with respect to J.L.'s behavior. See 29 C.F.R. § 1604.11(e); Minn. Stat. § 363.01, subd. 41(3). The district court decided that Focus Homes did not have any control over J.L.'s conduct because it could not have done anything to stop him immediately. While we recognize that Focus Homes faced multiple obstacles in immediately preventing J.L. from acting out, including J.L.'s limited ability to understand or respond to directives and the regulatory framework within which Focus Homes must operate, that does not end the inquiry. Focus Homes clearly controlled the environment in which J.L. resided, and it had the ability to alter those conditions to a substantial degree. The appellants requested that Focus Homes provide additional male staff, more training, and alarms or emergency back-up procedures to address their concerns. They also sought the implementation of a state-regulated deprivational program

and medication of J.L. to control his sexual urges.  In its brief, Focus Homes contests the possibility or effectiveness of implementing any of the appellants' suggestions.  Conflicting expert opinions in the record, ranging from "Focus Homes appeared to exacerbate this problem with unnecessary delays, omissions, inadequate training and imprudent decisions" (Appellant's App. at 374) to "Focus Homes' response . . . was exemplary" (Id. at 387) further highlight that factual disputes remain as to whether Focus Homes' response was appropriate.  The district

court should not have foreclosed this factual inquiry.[5] We thus reverse the grant of summary judgment on appellants' sexual harassment claim.

Turning to appellants other claims, we frankly do not understand the contention that Focus Homes aided and abetted in the sexual harassment in violation of Minn. Stat. § 363.03, subd. 6(1)-(2), particularly who it is that Focus Homes is alleged to have aided or abetted. We also agree with the district court that appellants have not offered sufficient evidence that Focus Homes retaliated against them for filing a Vulnerable Adult Act claim. Assuming that Focus Homes did not invite Miskowic and Elbers to attend meetings about the residents at the end of February, that conduct alone does not rise to the level of an adverse employment action. Moreover, by the time the claim was filed, the conflict between the appellants and Focus Homes had long been brewing and was much more likely the cause of any action by Focus Homes against the appellants than the Vulnerable Adult Act claim. Finally, we agree with the district court that appellants have not presented sufficient evidence to prove a claim of either intentional or negligent infliction of emotional distress under Minnesota law. Focus Homes' response to appellants' concerns, even viewed in the most favorable light to the appellants, does not meet the very high standard of "extreme and outrageous" conduct necessary to establish a claim for intentional infliction of emotional distress. See

---

[5]We caution the district court, however, that the inquiry is not whether Focus Homes' response was the <u>best</u> course of action possible, but rather whether it was appropriate in light of all the circumstances.

<u>Haagenson v. National Farmers Union Property & Cas. Co.</u>, 277 N.W.2d 648, 652 n.3 (Minn. 1979) (conduct must be "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community") (citing Restatement (Second) of Torts § 46 cmt. d (1965)).  Nor have the appellants alleged that they suffered any physical injuries as a result of their alleged severe emotional distress, a necessary element for their negligence claim.  <u>See</u> <u>K.A.C. v. Benson</u>, 527 N.W.2d 553, 557 (Minn. 1995) (emotional distress must have attendant physical manifestations).  We

therefore affirm the district court's grant of summary judgment for Focus Homes on these four claims.

## III.

Accordingly, we reverse the district court's grant of summary judgment for Focus Homes on appellants' sexual harassment claim and remand for action consistent with this opinion.  In all other respects, we affirm the district court.

A true copy.

Attest.

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.